731 So.2d 881 (1999)
Evelyn Decuir RUCKSTUHL and Richard E. Ruckstuhl
v.
OWENS CORNING FIBERGLAS CORPORATION, et al.
No. 98-CC-1126.
Supreme Court of Louisiana.
April 13, 1999.
*882 George R. Covert, Sean D. Fagan, Baton Rouge, for Applicant.
John J. Hainkel, Frilot, Partridge, Kohnke & Clements, New Orleans; John D. Cosmich; Edwin A. Ellinghausen, III, Porteous, Hainkel, Johnson & Sarpy; Michael D. Harold, Julie DeFulco Robles, Hailey McNamara, Hall, Larmann & Papale, Metairie; J. Michael Johnson, Galloway, Johnson, Tomplins & Burr, New Orleans; Susan B. Kohn, Simon, Peragine, *883 Smith & Redfearn, New Orleans; Steven W. Copley, Gordon, Arata, McCullam & Dulantis, New Orleans; Charles V. Giordano, Album, Stovall, Radecker & Giordano, Metairie; David L. Guerry, Michael A. Patterson, Baton Rouge, Andrew J. McDlaney, Jr., Daniel P. Olohan, Nutter, McLennen & Fish; Arthur W. Stout, III, Deutsch, Kerrigan & Stiles; George R. Covert, Sean D. Fagan, Baton Rouge, for Resondent.
VICTORY, J.[*]
We granted this writ to determine whether this state may exercise personal jurisdiction over a nonresident corporate defendant who manufactured and supplied, in vast quantities, a major component part of a product which entered Louisiana through the marketing and distribution practices of the end product manufacturer and purportedly injured a Louisiana resident.

FACTS AND PROCEDURAL HISTORY
In March of 1996, Evelyn Ruckstuhl, a resident of East Baton Rouge Parish, was diagnosed with malignant mesothelioma, a form of lung cancer, as a result of exposure to asbestos. Mr. and Mrs. Ruckstuhl filed a petition for damages against ten defendants[1], including Hollingsworth and Vose Company ("H & V"), Vose Specialties Co., Inc. ("Specialties"), and Lorillard Tobacco Company ("Lorillard"), in the parish of East Baton Rouge on January 13, 1997. Plaintiffs allege that between 1952 and 1959, Mrs. Ruckstuhl inhaled asbestos fibers and dust from her husband's work clothes during his employment at the Exxon refinery and that she smoked Kent cigarettes with a "Micronite" filter containing crocidolite asbestos. They assert that during that period, H & V and/or its wholly owned subsidiary, Specialties, manufactured, sold, and/or distributed the asbestos-containing filter material to Lorillard, which was then used by Lorillard to create the Micronite filter, a component part incorporated into Kent cigarettes that were distributed throughout the nation. Plaintiffs argue that H & V clearly "delivered its product into the stream of commerce with the expectation that its filters would be purchased along with the Kent cigarettes in Louisiana" since approximately 13 billion Kent cigarettes were sold during this period containing the Micronite filters with the asbestos manufactured by H & V. Plaintiffs further point out that the Kent Micronite filter was extensively advertised nationally, both in print and on television.
On March 20, 1997, H & V timely filed a Declinatory Exception of Lack of Personal Jurisdiction supported by an affidavit executed by Paul Walker, Director of Regulatory Affairs at H & V. According to the affidavit, Specialties was a wholly-owned subsidiary of H & V which entered into a contract with Lorillard in February 1952, whereby Specialties would manufacture bulk filter material for Lorillard to use in the Kent Micronite filter. Specialties manufactured the filter material in Massachusetts from early 1952, the date of its incorporation, until May 1956, before being merged into H & V in 1957. The bulk filter media was shipped directly from Specialties' plants in Massachusetts to Lorillard's manufacturing plants in New Jersey and Kentucky, where it was incorporated into the Micronite filter. The affidavit further states that Specialties never sold, delivered, advertised, or marketed its filter material in Louisiana, did not design the filter media for any Louisiana market, did not have any Louisiana customers for such product, and did not maintain an office or obtain a license to do business in *884 Louisiana. Moreover, the affidavit states that H & V has never had an office or other place of business in Louisiana, does not have any employees in Louisiana, is not registered to do business in Louisiana, does not maintain any bank accounts in Louisiana, and does not maintain toll-free numbers for the use of Louisiana residents.
Following oral arguments, the trial court denied H & V's exception. H & V timely filed its application for supervisory writs with the court of appeal and on February 20, 1998, the First Circuit reversed the district court's ruling and granted H & V's declinatory exception. In so holding, the First Circuit adopted the "stream of commerce plus" theory as articulated by Justice O'Connor in Part II-A of her opinion in Asahi Metal Industry Co., Ltd. v. Superior Court of California, Solano County, 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987), and held that H & V's placement of the filter media into the stream of commerce was insufficient to establish sufficient minimum contacts with Louisiana. Ruckstuhl v. Owens Corning Fiberglas Corp., 97-1132 (La.App. 1st Cir.2/20/98), 709 So.2d 238, 242. We granted plaintiffs writ to consider whether this ruling was correct. Ruckstuhl v. Owens Corning Fiberglas Corp., 98-C-1126 (La.6/19/98), 720 So.2d 1208.

DISCUSSION
Historically, the jurisdiction of the state courts to render judgments in personam was limited to a defendant's physical presence within the court's territorial jurisdiction. Pennoyer v. Neff, 95 U.S. 714, 733, 24 L.Ed. 565 (1877). However, recognizing the realities of modern commercial life, the United States Supreme Court in International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), rejected the legal fiction of "presence" and instead focused its attention on the due process aspect of personal jurisdiction. The Court held that subjecting a nonresident defendant to a judgment in personam requires that he must "have certain minimum contacts with [the state] such that the maintenance of the suit does not offend `traditional notions of fair play and substantial justice.'" International Shoe, 326 U.S. at 316, 66 S.Ct. 154 (citing Milliken v. Meyer, 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940)). Further, "[w]hether due process is satisfied must depend ... upon the quality and nature of the activity in relation to the fair and orderly administration of the laws." Id. at 319, 66 S.Ct. 154.
The Louisiana legislature enacted Louisiana's first Long-arm Statute in 1964 in order "to permit the courts of this state to tap the full potential of jurisdiction in personam over nonresidents permitted by International Shoe Co. v. State of Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95, 161 A.L.R. 1057 (1945); and McGee v. International Life Insurance Company, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957)." La. R.S. 13:3201, Comment (a).
The original statute, La. R.S. 13:3201, listed specific activities by a defendant which would subject it to the personal jurisdiction of this state.[2] In reaction to *885 the decision of the United States Supreme Court in World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980), in 1984, Subsection (h) was added[3] to provide for jurisdiction over a cause of action arising from a nonresident's:
Manufacturing of a product or component thereof which caused damage or injury in this state, if at the time of placing the product into the stream of commerce, the manufacturer could have foreseen, realized, expected, or anticipated that the product may eventually be found in this state by reason of its nature and the manufacturer's marketing practices.
However, realizing that the Long-arm Statute still did not really extend to the limits allowed by due process, in 1987, the legislature amended La. R.S. 13:3201 by Acts 1987, No. 418 to add Subsection B which provides:
In addition to the provisions of [13:3201(A)], a court of this state may exercise personal jurisdiction over a nonresident on any basis consistent with the constitution of this state and the Constitution of the United States.
Thus, although the legislature adopted the stream of commerce language from World-Wide Volkswagen in enacting La. R.S. 13:3201A(8), our relevant inquiry is properly directed at the broader jurisdictional provision, La. R.S. 13:3201B, which was intended to allow Louisiana courts to exercise personal jurisdiction over non-resident defendants to the fullest extent allowed by the United States Constitution, even if non-resident's conduct is not specifically listed in the provisions of La.R.S. 13:3201A..
Accordingly, "[t]he limits of the Louisiana Long-arm Statute and the limits of constitutional due process are now coextensive." Petroleum Helicopters, Inc. v. Avco Corp., 513 So.2d 1188, 1192 (La.1987). "Now, under the express wording of the present Long-arm Statute, the sole inquiry into jurisdiction over a nonresident is a one-step analysis of the constitutional due process requirements." Id.

The Due Process Test
The due process test first enunciated in International Shoe requires that in order to subject a nonresident defendant to a personal judgment, the defendant must have certain minimum contacts with the forum state such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. International Shoe, supra, 326 U.S. at 320, 66 S.Ct. at 160. The test has been interpreted by the United States Supreme Court in a series of cases since International Shoe. See Superior Supply Co. v. Associated Pipe & Supply Co., 515 So.2d 790, 792-796 (La.1987) for a summary of each of these cases.
The test has evolved into a two-part test, the first part being the "minimum contacts" prong, which is satisfied by a single act or actions by which the defendant "purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985); Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958). The nonresident's "purposeful availment" must be such that the defendant "should reasonably anticipate being haled into court" in the forum state. World-Wide Volkswagen Corp. v. Woodson, supra, 444 U.S. at 297, 100 S.Ct. 559.
The second part of the due process test centers around the fairness of the assertion of jurisdiction. Hence, once the plaintiff meets his burden of proving minimum *886 contacts, "a presumption of reasonableness of jurisdiction arises" and "the burden then shifts to the opposing party to prove the assertion of jurisdiction would be so unreasonable in light of traditional notions of fair play and substantial justice as to overcome the presumption of reasonableness created by the defendant's minimum contacts with the forum." de Reyes v. Marine Management and Consulting, Ltd., 586 So.2d 103, 107 (La.1991) (citing 4 Charles A. Wright and Arthur R. Miller, Federal Practice and Procedure Sec. 1067, pp. 301-302).

Minimum Contacts
The paramount issue in this case is whether the "minimum contacts" prong of the due process test can be met under the U.S. Constitution where a component parts manufacturer sells all of his product to an end product manufacturer with the knowledge that the end product will reach the forum state through the marketing and distribution processes of the end product's manufacturer, but has no direct contact with the state.
In 1980, the United States Supreme Court, in World-Wide Volkswagen v. Woodson, held that Oklahoma could not subject a New York corporate retail automobile dealer to jurisdiction for a product liability claim arising from an Oklahoma automobile accident where the plaintiffs had purchased their car in New York when they were New York residents. World-Wide Volkswagen v. Woodson, supra. Joined as defendants were the manufacturer, the importer, the regional distributor, and the retail dealer, but only the distributor and dealer, both New York corporations, challenged jurisdiction. The Court held that the Oklahoma court lacked jurisdiction over the distributor and dealer based on this one isolated and fortuitous circumstance that the automobile happened to suffer an accident as the plaintiff brought it into Oklahoma. As the Court noted, there was a "total absence of those affiliating circumstances that are a necessary predicate to any exercise of state-court jurisdiction" over the distributor and dealer. Id., 444 U.S. at 295, 100 S.Ct. 559. The distributor and the dealer carried on no activity in Oklahoma, closed no sales and performed no services in Oklahoma, solicited no business in Oklahoma, directed no advertisement in Oklahoma, and did not "regularly sell cars at wholesale or retail to Oklahoma customers or residents or that they indirectly, through others, serve or seek to serve the Oklahoma market." Id., 444 U.S. at 296, 100 S.Ct. 559. Significantly, the Court noted that "the mere `unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State.'" Id. (citing Hanson v. Denckla, supra).
However, after expressing this limitation as it applied to retail dealers and regional distributors, the Court stated:
When a corporation "purposefully avails itself of the privilege of conducting activities within the forum State," Hanson v. Denckla, 357 U.S. at 253, 78 S.Ct. at 1240, it has clear notice that it is subject to suit there, and can act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the State. Hence if the sale of a product of a manufacturer or distributor such as Audi or Volkswagen is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others. The forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the *887 forum State. Cf. Gray v. American Radiator & Standard Sanitary Corp., 22 Ill.2d 432, 176 N.E.2d 761 (1961).
Id., 444 U.S. at 297-298, 100 S.Ct. 559.[4] The above language from World-Wide Volkswagen recognizes the "stream of commerce" theory. However, because the example used by the Court was directed at manufacturers and distributors such as Audi and Volkswagen, and only the retail dealer and regional distributor were contesting jurisdiction, the "stream of commerce" language of World-Wide Volkswagen is dicta. See also Howard B. Stravitz, Sayonara to Minimum Contacts: Asahi Metal Industry Co. v. Superior Court, 39 S.C.L.Rev. 729, 761, 786, 788 (1988).
This dicta in World-Wide Volkswagen was the subject of a sharply divided Court in 1987 in Asahi Metal Industry Co., Ltd., supra. There, the Court held that it would be a denial of due process to subject a Japanese manufacturer of a motorcycle tire valve assembly to jurisdiction in California for an indemnification claim, the only claim remaining in the suit, asserted by the tire manufacturer, a Taiwanese corporation, in a product liability suit based on a California accident. All of the justices, except Justice Scalia, agreed that the second prong of the Due Process test, the "fairness" prong, had not been met. However, the Court was split on whether the first prong, the "minimum contacts" test, had been shown.
Justice O'Connor, who authored the plurality opinion of the Court in Asahi, was joined by three other justices, Chief Justice Rehnquist, and Justices Powell and Scalia, in requiring "additional conduct" by the defendant to support personal jurisdiction under the stream of commerce theory:
The substantial connection between the defendant and the forum state necessary for a finding of minimum contacts must come about by an action of the defendant purposefully directed toward the forum state. The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum state ... [A] defendant's awareness that the stream of commerce may or will sweep the product into the forum state does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum state.
Asahi, supra, 480 U.S. at 112, 107 S.Ct. at 1032 (cites omitted). This theory is referred to as the "stream of commerce plus" theory.[5]
*888 Four of the justices in Asahi expressly disagreed with Justice O'Connor's "stream of commerce plus" theory and reaffirmed their interpretation of the "stream of commerce" language from World-Wide Volkswagen. In his concurring opinion, Justice Brennan (joined by Justices White, Marshall, and Blackmun) expressed that he did "not agree with the interpretation in Part II-A of the stream-of-commerce theory, nor with the conclusion that Asahi did not `purposefully avail itself of the California market.'"[6] 480 U.S. at 116, 107 S.Ct. 1026 (emphasis added). Finally, the ninth justice, Justice Stevens, stated that it was unnecessary to discuss minimum contacts when reversal could be supported on fairness grounds. Justice Stevens, however, did express his view as to whether or not the conduct of the component parts manufacturer rose to the level of "purposeful availment:"
Second, even assuming that the test ought to be formulated here, Part II-A misapplies it to the facts of this case. The plurality seems to assume that an unwavering line can be drawn between "mere awareness" that a component will find its way into the forum State and "purposeful availment" of the forum's market. Ante, at 1033. Over the course of its dealings with Cheng Shin, Asahi has arguably engaged in a higher quantum of conduct than "[t]he placement of a product into the stream of commerce, without more...." Ibid. Whether or not this conduct rises to the level of purposeful availment requires a constitutional determination that is affected by the volume, the value, and the hazardous character of the components. In most circumstances I would be inclined to conclude that a regular course of dealing that results in deliveries of over 100,000 units annually over a period of several years would constitute "purposeful availment" even though the item delivered to the forum State was a standard product marketed throughout the world.

480 U.S. at 122, 107 S.Ct. at 1037 (emphasis added).[7]
In the case at bar, the court of appeal found that "the Asahi approach more accurately reflects the due process protections afforded under the United States Constitution and more closely comports with the purposes of due process." Thus, the court of appeal applied the "stream of commerce plus" theory and found that the plaintiffs failed to prove that H & V established minimum contacts with Louisiana under that theory.
*889 However, under the facts of this case, we find it unnecessary to adopt either the stream of commerce or the stream of commerce plus theory. We note that the stream of commerce theory with regard to manufacturers is dicta in World-Wide Volkswagen and is not binding law. Further, the attempted modification [stream of commerce plus theory] led by Justice O'Connor in Asahi did not receive enough votes to make it law. Therefore, we have no Supreme Court precedent that guides us as to which theory, if either, represents the law. Nevertheless, we can decide this case without regard to either theory.
The facts presented in this case show that H & V and Lorillard had a much closer relationship than that of a general component part manufacturer supplying parts to an end product manufacturer, as was the case in Asahi. Specialties was incorporated in February of 1952 as a wholly-owned subsidiary of H & V. In February of 1952, Specialties signed an exclusive contract with Lorillard for the purchase of filter material,[8] which allegedly contained crocidolite asbestos. Specialties manufactured and shipped the filter material from its plants in Massachusetts to Lorillard's manufacturing plants in New Jersey and Kentucky where it was incorporated into the Kent Micronite Filter cigarettes. The total amount of filter material shipped by Specialties to Lorillard is not clear, but the record contains evidence that from 1952 to 1956, Specialties shipped enough filter material to Lorillard in order for Lorillard to incorporate the filter material into thirteen billion Kent Micronite Filter cigarettes. As evidence of the voluminous character of this relationship, the record shows that from January 1, 1955 to August 22, 1955, Specialties produced 7,065 rolls of the filter material and Lorillard consumed 12,532 rolls of the filter material. Further, Lorillard's approximate daily consumption in 1955 was 80 rolls, while Specialties average daily production was 68 rolls.[9] In order to remedy this difference between consumption and production, Lorillard was forced to use its and Specialties' reserve inventories.
Moreover, between 1952 and 1956, the Kent Micronite Filter cigarette was extensively advertised in both the print and television media. All the advertisements centered around the "Micronite" filter, the benefits of the filter, and the fact that Kent Micronite Filter cigarettes were made "with [the] exclusive Micronite Filter."[10] The print advertisement was *890 found in such nationally distributed mediums as Life Magazine. Further, the Kent Micronite Filter cigarette was advertised on nationally broadcasted television programs in the 1950s.
Thus, one of the prime selling points of the Kent Micronite Filter cigarette was the filterthe alleged injury causing product manufactured by Specialties, sold in massive quantities to Lorillard by Specialties, and incorporated as a substantial and integral component part of the Kent Micronite Filter cigarettes.
Accordingly, H & V, or its subsidiary, made a single product for a single purpose for a single customer for a period of five years. Lorillard focused on H & V's "exclusive Micronite Filter" as the chief feature in virtually all of Kent cigarette advertising and forcefully distributed that product into the national marketplace. H & V knew and intended that the Kent cigarette with the "Micronite Filter" would be sold by Lorillard on a large scale basis nationwide. Thus, in our view considering all these factors, H & V "purposefully availe[d] itself of the privilege of conducting activities within [this state]." Burger King v. Rudzewicz, supra, 471 U.S. at 475, 105 S.Ct. 2174. Undoubtedly, through this purposeful availment, H & V "should reasonably anticipate being haled into court" in Louisiana.[11]World-Wide Volkswagen, supra, 444 U.S. at 297, 100 S.Ct. 559.

Fair Play and Substantial Justice
Even if minimum contacts exist, the exercise of personal jurisdiction over a nonresident defendant will fail to satisfy due process requirements if the assertion of jurisdiction offends "traditional notions of fair play and substantial justice." International Shoe, supra, 326 U.S. at 316, 66 S.Ct. 154. In determining this fundamental fairness issue, we must examine (1) the defendant's burden; (2) the forum state's interest; (3) the plaintiff's interest in convenient and effective relief; (4) the judicial system's interest in efficient resolution of controversies; and (5) the state's shared interest in furthering fundamental social policies. Asahi, supra, 480 U.S. at 112, 107 S.Ct. 1026; World-Wide Volkswagen, supra, 444 U.S. at 292, 100 S.Ct. 559.
First, H & V's burden in traveling from Massachusetts to Louisiana is considerable. Nonetheless, today's modern transportation has made it less burdensome for a party to defend himself in a state where he engages in economic activity. See McGee v. International Life Ins. Co., supra. Further, the interests of the plaintiff and the forum may "justify even the serious burdens placed on the alien defendant." Asahi, 480 U.S. at 114, 107 S.Ct. 1026. Unlike in Asahi, where the defendant would have to travel all the way from Japan to defend against an indemnification claim brought by a Taiwanese corporation based on a transaction that took place in Taiwan, here, the corporate defendant will only have to travel within the United States to defend against a claim brought by a Louisiana plaintiff based on an injury that occurred in Louisiana.
Second, Louisiana has a significant interest in adjudicating a dispute that involves a sale of an allegedly defective product to a Louisiana consumer where that product causes a personal injury in *891 this state. See McBead, supra at 432. This is in stark contrast to the facts of Asahi, where the state of California had little interest in an indemnity claim involving non-California parties. The continued presence of the injured parties and various state interests in the litigation distinguishes the case from the situation presented in Asahi. Further, the Louisiana forum will bring all the parties into one courtroom for a single resolution.
Finally, in considering the shared interest of the several states in furthering fundamental substantive social policies, we must look to the procedural and substantive policies of other states whose interests are affected by the assertion of jurisdiction by this Court. Here, we have no international concerns as did the Supreme Court in Asahi. The interests of the other states in providing convenient forums for parties involved in cigarette-related litigation are furthered by allowing plaintiffs to proceed against H & V and/or Specialties in Louisiana.

CONCLUSION
We find that H & V purposefully availed itself of the privilege of conducting business in Louisiana such that it should reasonably anticipate being haled into court here by supplying all of its product only to Lorillard with the knowledge and intention that Lorillard would market and distribute the end product, which featured the "Micronite Filter" made with H & V's product, on a large-scale nationwide basis. Further, we find that the maintenance of personal jurisdiction over H & V does not offend traditional notions of fair play and substantial justice. Accordingly, H & V and/or Specialties is subject to the personal jurisdiction of this court.

DECREE
For the reasons stated herein, the judgment of the court of appeal is reversed and H & V's declinatory exception of lack of personal jurisdiction is denied. The case is remanded to the trial court for further proceedings.
REVERSED AND REMANDED.
TRAYLOR, J., dissents and will assigns reasons.
TRAYLOR, Justice, dissenting.
The business arrangement between Lorillard and H & V did not rise to the level of establishing personal jurisdiction over H & V and/or Specialties because none of its conduct was in any way directed toward Louisiana. Specialties clearly had no involvement in the manufacturing, marketing, sale, or distribution of Kent cigarettes. Its relationship to Lorillard was that of a supplier; Specialties manufactured the bulk filter material in Massachusetts and shipped it directly to Lorillard's plants in New Jersey and Kentucky.
The majority makes a distinction without a difference when applying the law to the facts at hand. Although they proclaim to decide the case without regard to either the stream of commerce plus or stream of commerce theory, the majority clearly utilizes the latter theory. However, the Due Process Clause requires that the action of the defendant to be more purposefully directed at the forum State than the mere act of placing a product in the stream of commerce. The United States Supreme Court has reiterated this principle throughout the years, providing further insight into the concept of minimum contacts. See Superior Supply Co. v. Assoc. Pipe & Supply Co., 515 So.2d 790 (La. 1987). In World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980), the Court expounded on the principles enunciated in International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), by rejecting the notion that foreseeability based on a "mere likelihood" that a product would find its way to the forum state could establish jurisdiction, stating instead that the person should "reasonably anticipate being haled into court there." *892 World-Wide Volkswagen Corp., 444 U.S. at 296-97, 100 S.Ct. at 567. World-Wide Volkswagen Corp., fairly read, requires a greater connection to the forum state than selling chattel that might foreseeably arrive there through the acts of another person, thereby indicating that the Court has not abandoned the notion that jurisdiction must rest on a person's activity deliberately directed toward the forum state.
The Court in Burger King Corp. v. Rudzewicz, 471 U.S. 462, 473-77, 105 S.Ct. 2174, 2183-84, 85 L.Ed.2d 528 (1985), later held jurisdiction to be proper when the defendant's contacts "result from actions by the defendant himself that create a `substantial connection' with the forum State." Specifically, the Court held that an individual's contract with an out-of-state party alone could not establish minimum contacts in the other party's home forum. Burger King Corp., 471 U.S. 462, 477-79, 105 S.Ct. at 2185. Rather, the Court required an evaluation of prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing before a determination could be made whether the defendant purposefully established minimum contacts with the forum. Simply stated, the Court rejected a mechanical interpretation of the minimum contacts required to confer personal jurisdiction. Id. Instead, it relied upon the quality and nature of the activity to determine whether such contacts justify the state's exercise of its judicial power over the person. International Shoe Co. v. Washington, 326 U.S. at 319-21, 66 S.Ct. at 160. Most recently, Justice O'Connor, joined by Chief Justice Rehnquist and Justices Powell and Scalia, of the Asahi Court, held that "minimum contacts" requires the defendant to act purposefully toward the forum state, thereby mandating much more of the defendant than mere knowledge of the product's entry into the forum state through the stream of commerce. Asahi Metal Ind. v. Super. Ct. of Cal., Solano City, 480 U.S. 102, 111-13 107 S.Ct. 1026, 1032, 94 L.Ed.2d 92 (1987).
Specialties' placement of the bulk filter material into the stream of commerce, without other conduct directed toward Louisiana, is not an act purposefully directed toward Louisiana. Asahi Metal Ind., 480 U.S. at 111-13, 107 S.Ct. at 1032.[1] Even though Specialties may have been aware that the stream of commerce would sweep its filter media into other states, such cognizance does not convert the mere act of placing the product into the stream into an act purposefully directed toward every state to which Kent cigarettes were distributed. Id. Due Process requires that the defendant himself have contacts with the forum state such that a "substantial connection" is created. Only then will jurisdiction be proper. Asahi Metal Ind., 480 U.S. at 107-09, 107 S.Ct. at 1030; Burger King Corp., 471 U.S. at 473-77, 105 S.Ct. at 2183-84.
By requiring that individuals have "fair warning" that a particular activity may subject them to the jurisdiction of a foreign sovereign, the Due Process Clause gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit. World-Wide Volkswagen Corp., 444 U.S. at 296-98, 100 S.Ct. at 567; Burger King Corp., 471 U.S. at 472-73, 105 S.Ct. at 2182. When a forum seeks to assert specific jurisdiction over an out-of-state defendant who has not consented to suit there, this "fair warning" requirement is *893 satisfied if the defendant has purposefully directed his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities. Burger King Corp., 471 U.S. at 472-73, 105 S.Ct. at 2182. Without such notice, defendants could not alleviate the risk of litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the State. World-Wide Volkswagen Corp., 444 U.S. at 296-98, 100 S.Ct. at 567. To permit a state to assert jurisdiction over any person whose product is sold in the state simply because a person may expect that to happen subjects defendants to judgment in locations based on the activity of third persons and not the deliberate conduct of the defendant, making it impossible for defendants to plan and structure their business contacts and risks. Lesnick v. Hollingsworth & Vose Co., 35 F.3d 939, 945 (4th Cir.1994).
While the total volume of Lorillard's national sales from 1952 to 1956 perhaps made it foreseeable that Lorillard might sell some portion of its cigarettes in Louisiana, "the foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum state. Rather, it is that the defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there." World-Wide Volkswagen Corp., 444 U.S. at 297, 100 S.Ct. at 567. A manufacturer's conduct must evidence an effort to serve the forum market before the manufacturer can reasonably anticipate being haled into court there. Id. Otherwise, defendants may be subject to the caprice of third persons, thereby stripping them of the protections the Due Process Clause was designed to ensure.
Although the case might be different if H & V had changed production to comply with Louisiana regulations or if it had set up a customer relations network there, Asahi, 480 U.S. at 111-13, 107 S.Ct. at 1032, all of the contacts between Lorillard and H & V relate only to H & V's agreement to supply filters from its plant in Massachusetts to Lorillard in Kentucky and New Jersey. Because Specialties' contacts with Louisiana are attenuated to the point that it should not have reasonably anticipated being haled into court in Louisiana, H & V and/or Specialties is not amenable to personal jurisdiction in Louisiana. Accordingly, I respectfully dissent.
NOTES
[*] Kimball, J., not on panel. Rule IV, Part 2, § 3.
[1] The other eight defendants are Owens-Corning Fiberglas Corporation, Owens-Illinois, Inc., Pittsburgh Corning Corporation, The Babcock & Wilcox Company, Combustion Engineering, Inc., Rapid American Corporation, Anco Insulations, Inc., and McCarty Corporation.
[2] Originally, La. R.S. 13:3201 provided:

A court may exercise personal jurisdiction over a nonresident, who acts directly or by an agent, as to a cause of action arising from the non-resident's:
(a) transacting any business in this state;
(b) contracting to supply services or things in this state;
(c) causing injury or damage by an offense or quasi offense committed through an act or omission in this state;
(d) causing injury or damage in this state by an offense or quasi offense committed through an act or omission outside of this state if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this state; or
(e) having an interest in, using, or possessing a real or immovable property in this state.
In addition, La. R.S. 13:3202 expressly limited La.R.S. 13:3201 to causes of action arising from acts or omissions enumerated therein.
[3] In 1984, the designations were also changed from letters to numerals such that Subsection (h) is now Subsection (8).
[4] This Court has noted the difference, in the context of personal jurisdiction in products liability cases, between a manufacturer and a distributor. McBead Drilling Co. v. Kremco, Ltd., 509 So.2d 429, 432 (La.1987) (holding that "[i]n litigation arising from a product related injury in the forum state, there are significant differences between the exercise of jurisdiction over a retailer who simply sold the product locally and the exercise of jurisdiction over a manufacturer whose products were sold over a large area.").
[5] Federal circuit courts are somewhat divided on whether to apply the "stream of commerce" theory or the "stream of commerce plus" theory. Some courts have accepted Justice O'Connor's opinion rejecting the stream of commerce theory as a means of satisfying the purposeful availment requirement. Boit v. Gar-Tec Prods., Inc., 967 F.2d 671 (1st Cir.1992); Lesnick v. Hollingsworth & Vose Co., 35 F.3d 939 (4th Cir.1994), cert. denied, 513 U.S. 1151, 115 S.Ct. 1103, 130 L.Ed.2d 1070 (1995). Other courts addressing whether Asahi overturned the stream of commerce theory have resoundingly concluded that it did not. See e.g., Barone v. Rich Bros. Interstate Display Fireworks Co., 25 F.3d 610 (8th Cir.1994), cert. denied sub nom., Hosoya Fireworks Co., Ltd. v. Barone, 513 U.S. 948, 115 S.Ct. 359, 130 L.Ed.2d 313 (1994); Ruston Gas Turbines, Inc. v. Donaldson Co. Inc., 9 F.3d 415 (5th Cir.1993); Dehmlow v. Austin Fireworks, 963 F.2d 941 (7th Cir.1992). However, most courts have chosen to avoid taking a position, attempting when possible to decide the case on the basis of the facts in the record. See OMI Holdings, Inc. v. Royal Ins. Co. of Canada, 149 F.3d 1086 (10th Cir.1998); Renner v. Lanard Toys Ltd., 33 F.3d 277 (3rd Cir.1994); Beverly Hills Fan Co. v. Royal Sovereign Corp., 21 F.3d 1558, 1566 (Fed.Cir. 1994), cert. dismissed, 512 U.S. 1273, 115 S.Ct. 18, 129 L.Ed.2d 917 (1994) and Tobin v. Astra Pharmaceutical Products., Inc., 993 F.2d 528 (6th Cir.1993), cert. denied sub nom., Duphar v. Tobin, 510 U.S. 914, 114 S.Ct. 304, 126 L.Ed.2d 252 (1993) (both essentially rejecting Justice O'Connor's view, but finding sufficient additional contacts to satisfy it, as well as the stream of commerce theory); Vermeulen v. Renault, U.S.A., Inc., 985 F.2d 1534, 1548 (11th Cir.1993), cert. denied, 508 U.S. 907, 113 S.Ct. 2334, 124 L.Ed.2d 246 (1993); Shute v. Carnival Cruise Lines, 897 F.2d 377, 382 n. 3 (9th Cir.1990), rev'd on other grounds, 499 U.S. 585, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991); North American Philips Corp. v. American Vending Sales, Inc., 35 F.3d 1576 (Fed.Cir.1994) (hinting its approval for the stream of commerce theory by approving jurisdiction over a defendant who was conscious that his product would reach the forum state).
[6] As Justice Brennan's concurrence stated: "[t]he stream of commerce refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale." Asahi, supra, 480 U.S. at 117, 107 S.Ct. 1026. "As long as a participant in the process is aware that the final product is being marketed in the forum state, the possibility of a law suit there cannot come as a surprise." Id.
[7] Since the serious split of opinion by the United States Supreme Court over the stream of commerce theory versus the stream of commerce plus theory in Asahi in 1987, that Court has not addressed the issue. Further, since Asahi was decided, all four justices favoring the stream of commerce theory have left the Court, yet three of the four justices who voted for the stream of commerce plus theory remain on the Court, along with Justice Stevens. Finally, Justices Breyer, Ginsberg, Kennedy, Souter, and Thomas have joined the Court and their views on the stream of commerce issue are unknown.
[8] The federal appeals court in Lesnick v. Hollingsworth & Vose, 35 F.3d 939, 946 (4th Cir. 1994), a case similar to the case at bar, summarized the relationship between H & V and Lorillard as follows:

H & V and Lorillard entered a contract under which the two jointly owned the patent to the Micronite filter and agreed to share information about technical advances in the field.... The two also shared equally the costs of developing the filter, including the costs of creating manufacturing facilities, and they agreed to share any royalties they might earn from licensing the process. In addition, the price Lorillard paid for the filters was a multiple of H & V's cost, with Lorillard given a right to inspect production and financial records. H & V agreed to sell filter material for tobacco use only to Lorillard for at least five years of their dealings. Finally, Lorillard agreed to indemnify H & V for any liabilities arising from harmful effects of the product.
In Lesnick, however, the Fourth Circuit adopted the "stream of commerce plus" theory and found that H & V's conduct did not meet that test.
[9] Because consumption of Specialties' filter material was greater than its production, the record suggests that Lorillard's resolution of this problem could only be solved by Specialties operating two shifts to increase daily production to 90 rolls.
[10] An example of the print advertisement emphasizing these selling points was found in the April 19, 1954 edition of Life. The advertisement read:

The American Medical Association voluntarily conducted in their own laboratory a series of independent tests of filters and filter cigarettes. As reported in the Journal of American Medical Association, these tests proved that of all the filter cigarettes tested, one type was the most effective for removing tars and nicotine. This type filter is used by Kent ... and only by Kent!
[11] Defendant's argument that our prior decision in McBead, supra, requires a different result is misplaced. Although in McBead the nonresident component parts manufacturer's activity was more specifically directed at Louisiana than is H & V's, in that it sold the drilling rig, to which it had added component parts, directly to the plaintiff in the Ark-La-Tex region and then sent a service representative into Louisiana to service the rig at the time the rig collapsed, we did not predicate our finding of jurisdiction on the establishment of "additional conduct" as required by Justice O'Connor in Asahi. In fact, we noted that "while the plurality opinion discussed requirement that defendant's conduct be more purposefully directed at the forum state than the mere placing of the product in the stream of commerce," the concurring justices did not subscribe to that portion of the opinion. McBead, supra at 433, n. 7.
[1] Asahi provides four examples of additional conduct that may indicate an intent or purpose to serve the market in the forum State: (1) designing the product for the market in the forum State; (2) advertising in the forum State; (3) establishing channels for providing regular advice to customers in the forum State; (4) marketing the product through a distributor who has agreed to serve as the sales agent in the forum State. Asahi, 480 U.S. at 111-13, 107 S.Ct. at 1032.