807 So.2d 267 (2001)
Amy SPOMER
v.
AGGRESSOR INTERNATIONAL, INC.
No. 2000 CA 1646.
Court of Appeal of Louisiana, First Circuit.
September 28, 2001.
Writ Denied January 25, 2002.
*269 Michel P. Wilty, Stephen M. Wiles, Timothy J. Falcon, Deani Beard Milano, Falcon Law Firm, Marrero, Laurence W. Stinson, Cody, WY, for Plaintiff-Appellant Amy Spomer.
Brien J. Fricke, William B. Schwartz, Burke & Mayer, New Orleans, for Defendants-Appellees Aggressor International, Ltd., Cayman Aggressor, Ltd., and Certain Underwriters of Lloyds, London.
Before: CARTER, C.J., PARRO, and CLAIBORNE,[1] JJ.
PARRO, Judge.
Amy Spomer appeals a trial court judgment sustaining exceptions of lack of personal jurisdiction and insufficiency of service of process filed by Aggressor International, Ltd. and Cayman Aggressor, Ltd., sustaining an exception of "no right of action/no cause of action" filed by Certain Underwriters of Lloyds, London, and dismissing Spomer's Jones Act and general maritime claims against these defendants. We reverse and remand.

FACTUAL AND PROCEDURAL BACKGROUND
In October 1993, Amy Spomer began working for Cayman Aggressor, Ltd. as a dive instructor aboard the vessel, Cayman Aggressor III, serving recreational divers on one-week live-aboard excursions in the Cayman Islands, British West Indies. She allegedly suffered decompression sickness as a result of dive activities in the waters of the Cayman Islands while she was a member of the crew in April 1995. Her petition seeks damages and maintenance and cure under the Jones Act and general maritime law. In her original and supplemental petitions, she named as defendants Aggressor International, Inc.[2] (AIL), Aggressor Fleet, Ltd. (AFL), Cayman Aggressor Limited (CAL), and Certain Underwriters of Lloyds, London[3] (Lloyds). *270 The suit was filed in the 16th Judicial District Court, Parish of Iberia.
AFL, a Louisiana corporation owned by Louisiana resident Jill Haines, operates out of Morgan City, Louisiana, and is the exclusive booking agent for all dive trips aboard vessels operating under an "Aggressor Fleet®" franchise, including Cayman Aggressor III.[4] AFL also handles worldwide marketing for the franchised vessels. Before its conversion to a live-aboard dive vessel, Cayman Aggressor III was an oilfield supply vessel belonging to a Louisiana corporation owned by Jill Haines' husband, Paul Haines. AIL is a Cayman corporation[5] that supervises quality control and assists in marketing for vessels operating under an "Aggressor Fleet®" franchise, including Cayman Aggressor III. AIL rents an office to CAL and provides mail, telephone, clerical, and fax services, as well as warehouse space, to CAL. CAL, which is also a Cayman company,[6] operates the Cayman Aggressor III under a bareboat charter agreement with the owner of the vessel, Ocean Marine, Ltd.[7] CAL is also the franchisee of the "Aggressor Fleet®" franchise from AFFI. Its operational duties include hiring and supervising the crew, provisioning the vessel, and fulfilling the terms of the franchise and bareboat charter. The Cayman Aggressor III is insured by Lloyds. The insurance is purchased through an agent in Metairie, Louisiana, whose contact for binding coverage is a New Orleans broker.
The defendants filed various exceptions, including improper venue, insufficiency of service of process, lack of personal jurisdiction, lack of subject matter jurisdiction, and "no right/no cause" of action. The exceptions were heard by the court in Iberia Parish and most of them were overruled. However, the exception of improper venue was sustained, and the court ordered transfer of the suit to St. Mary Parish. The defendants applied for writs to the Third Circuit Court of Appeal, which denied the application for lack of jurisdiction, finding that because the suit had been transferred to St. Mary Parish, supervisory jurisdiction resided in the First Circuit Court of Appeal. An application for writs was then filed with the Louisiana Supreme Court, which vacated the trial court's judgment insofar as it addressed exceptions other than the exception of improper venue, stating that once the trial court determined that venue was improper, it could do nothing other than dismiss or transfer the suit. The case was remanded to the 16th Judicial District *271 Court for the Parish of St. Mary, with instructions that the relators could re-urge their exceptions in that court.
They did so, and submitted numerous depositions and documents to the court, stipulating that these could all be considered in connection with the exceptions. After a hearing, the court: (1) sustained the exceptions of lack of personal jurisdiction and insufficiency of service of process filed by AIL and CAL and dismissed Spomer's claims against them; (2) sustained the exception of "no right/no cause" of action filed by Lloyds and dismissed the suit against it; (3) overruled the exception of lack of subject matter jurisdiction filed by AFL; and (4) overruled the exception of improper venue.[8] Spomer has appealed portions of the judgment, alleging the trial court erred in sustaining the exceptions and dismissing her claims against AIL, CAL, and Lloyds.

PERSONAL JURISDICTION OVER A NONRESIDENT
Appellate courts conduct a de novo review of the legal issue of personal jurisdiction over a nonresident by a Louisiana court. Griffith v. French, 97-2635 (La.App. 1st Cir.12/28/98), 723 So.2d 1140, 1142, writ denied, 99-0220 (La.3/19/99), 740 So.2d 116. Under Louisiana's Long-Arm Statute, LSA-R.S. 13:3201(B), a court of this state may exercise personal jurisdiction over a nonresident on any basis consistent with the Louisiana Constitution and the Constitution of the United States. Therefore, the limits of the Louisiana Long-Arm Statute and the limits of constitutional due process are coextensive, and the sole inquiry into jurisdiction over a nonresident is a one-step analysis of the constitutional due process requirements. Ruckstuhl v. Owens Corning Fiberglas Corp., 98-1126 (La.4/13/99), 731 So.2d 881, 885.
The due process test requires that in order to subject a nonresident defendant to a personal judgment, the defendant must have certain minimum contacts with the forum state, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. International Shoe Co. v. State of Washington, 326 U.S. 310, 320, 66 S.Ct. 154, 160, 90 L.Ed. 95 (1945); de Reyes v. Marine Mgmt. & Consulting, 586 So.2d 103, 105 (La.1991). In interpreting the due process clause, the United States Supreme Court has recognized a distinction between two types of personal jurisdiction "general" and "specific." A state exercises general jurisdiction when the defendant's contacts with the state are not related to the lawsuit. Specific jurisdiction, on the other hand, is exercised when the suit arises out of or is related to the defendant's contacts with the forum. Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414, nn. 8 & 9, 104 S.Ct. 1868, 1872, nn. 8 & 9, 80 L.Ed.2d 404 (1984); Verdin v. Morania Oil Tanker Corp., 94-0916 (La.App. 1st Cir.5/5/95), 655 So.2d 542, 543. The two-part minimum contacts/fairness analysis applies to the assertion of specific as well as general jurisdiction. de Reyes, 586 So.2d at 109.
When a forum seeks to exercise specific jurisdiction over an out-of-state defendant who has not consented to suit there, the requirement of meaningful minimum contacts is satisfied when the defendant has purposefully directed his activities at residents of the forum and the litigation results from alleged injuries arising *272 out of or related to those activities. de Reyes, 586 So.2d at 106. When the cause of action, however, does not arise out of the defendant's purposeful contacts with the forum, due process requires that the defendant be engaged in continuous and systematic contact to support the exercise of general jurisdiction. A & L Energy, Inc. v. Pegasus Group, 00-3255 (La.6/29/01), 791 So.2d 1266, 1271. Contacts may be effected by mail and electronic communication, as well as physical presence. See Hunter v. Meyers, 96-1075 (La. App. 1st Cir.3/27/97), 691 So.2d 318, 323.
The second prong of the analysis is the fairness of the assertion of jurisdiction. The defendant's conduct and connection with the forum state must be such that it should reasonably anticipate being haled into court there. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985). Once the plaintiff meets the burden of proving minimum contacts, a presumption of reasonableness of jurisdiction arises, and the burden then shifts to the opposing party to prove the assertion of jurisdiction would be so unreasonable in light of traditional notions of fair play and substantial justice as to overcome the presumption of reasonableness created by the defendant's minimum contacts with the forum. Bordelon v. Dehnert, 99-2625 (La.App. 1st Cir.9/22/00), 770 So.2d 433, 439, writ denied, 00-2923 (La.3/19/01), 787 So.2d 995. In determining this issue, the court must examine the defendant's burden in litigating in the forum state, the forum state's interest, the plaintiffs interest in convenient and effective relief, the judicial system's interest in efficient resolution of controversies, and the state's shared interest in furthering fundamental social policies. Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102, 113, 107 S.Ct. 1026, 1033, 94 L.Ed.2d 92 (1987); Lentz v. Applegate, 98-1442 (La.App. 1st Cir.6/25/99), 739 So.2d 327, 330, writ denied, 99-2852 (La.12/10/99), 751 So.2d 258.
With these precepts in mind, we examine the record to determine whether AIL and CAL have sufficient contacts with this state, such that the exercise of jurisdiction over them would not offend traditional notions of fair play and substantial justice. The evidence demonstrates a web of interrelated activities among the defendants, all of which have a dual nexus between Louisiana and the Cayman Islands. Before being converted to a dive vessel, the Cayman Aggressor III was owned by a Louisiana corporation; that corporation was wholly owned by a Louisiana resident, Paul Haines. The vessel was converted in 1985-86 at Paul Haines' shipyard in Amelia, Louisiana. During its conversion to a dive vessel, Hasson, currently the agent of vessel owner Ocean Marine, Ltd. and 50% owner/manager of AIL, spent almost three months traveling back and forth between the Cayman Islands and Louisiana to supervise the conversion. He did the same thing several years later when the vessel was updated, and generally makes an annual visit to the shipyard in Louisiana owned by Paul Haines. Acting on behalf of AIL or CAL, Hasson orders specialty parts for the vessel from Paul Haines' shipyard and occasionally consults with him by telephone concerning mechanical problems on the "Aggressor Fleet®" vessels.
Hasson wrote the "Confidential Operating Manual" that is attached to and made a part of the "Aggressor Fleet®" franchise agreement. The most current version of that manual, which governs every aspect of a franchisee's vessel's operations, is maintained by the franchisor at its Louisiana *273 office.[9] The "Aggressor Fleet®" franchise is owned by AFFI, a Louisiana corporation owned by Louisiana resident Jill Haines and her Louisiana corporation. AFFI is the franchisor and CAL is the franchisee for the franchise agreement under which Cayman Aggressor III is operated. According to Jill Haines, the franchise agreement was executed in Morgan City, Louisiana. Under that agreement, all franchisee bookings must be made directly with AFL, which acts as the exclusive travel/booking agent for the Cayman Aggressor III. In connection with bookings and reservations, Jill Haines and other AFL employees communicate with Hasson, representing AIL and/or CAL, by telephone and facsimile machine at least weekly and often daily. AFL also handles all marketing for the vessels operating under "Aggressor Fleet®" franchises. The advertising materials, which are distributed by AFL world-wide in specialty magazines, at trade shows, through dive shops, and in direct mailings, show AFL's Morgan City, Louisiana, address to obtain further information concerning dive cruises. The toll-free telephone number on those materials is also for the AFL office in Louisiana. There is no address or telephone number for the Cayman corporations on these materials, so all inquiries from the general public regarding dive trips must be made through AFL's Louisiana office.
The franchise agreement further states that Cayman Aggressor III must be used solely for the purpose of conducting the "Aggressor Fleet®" franchise; any other use must have AFFI's prior written consent. The franchise agreement states that AFFI and CAL agree that its provisions are to be interpreted and construed under the maritime laws of the United States and, in the absence of such law, the laws of the state of Louisiana. The parties to the franchise agreement also specifically stipulate to the exclusive jurisdiction of Louisiana courts for any claims or disputes that might arise between them. AFL is deemed a third-party beneficiary of the franchise agreement; AFFI and AFL, along with CAL and the vessel owner, are to be named as "indemnified parties" on the required insurance coverage for the vessel.
Ninety percent of the Cayman Aggressor III passengers are United States residents. All customer payments for dive cruises on Cayman Aggressor III must be made payable to and sent to AFL in Morgan City, Louisiana. AFL retains 30% for its commission and sends the remaining 70% to CAL.[10] From its share, CAL pays its operating expenses, including provisioning the vessel, paying its captain and crew, and paying its charter fee to the vessel owner. CAL also pays $1500 per month to AIL for office and warehouse space, as well as phone, fax, management, and clerical services. In addition to the rental payment from CAL, AIL also receives $50 per passenger, which is paid directly to it by AFL, for its role in monitoring quality control, handling customer complaints, and assisting in marketing the "Aggressor *274 Fleet®." To fulfill AIL's marketing function, Hasson, acting as its agent, annually attends trade shows in the United States put on by "DEMA," the Diving Equipment Manufacturers Association. AFL buys a booth at this show each year and Hasson works with AFL to coordinate its presentations and solicit business for the "Aggressor Fleet®" from other participants in the trade show. In 1994, the year before Spomer's mishap, the DEMA show was in New Orleans.
CAL operates Cayman Aggressor III under a bare boat charter agreement between it and the vessel owner, Ocean Marine, Limited. Charter payments are 20% of the per passenger charge for each paying passenger on the vessel during the term of the charter. Like all other passenger charges, CAL receives these fees from AFL in Louisiana. The charter requires the vessel to be operated under the "Aggressor Fleet®" franchise with AFFI; should that franchise be lost or terminated, the vessel owner can retake the vessel or require its delivery to a designated port. Upon termination of the charter, CAL is to return the vessel to the owner at any port the owner might designate, "such return port to have a distance no further away than AMELIA, LOUISIANA, USA." AFFI and AFL are deemed third-party beneficiaries of the charter. The charter is to be construed pursuant to the general maritime law of the United States, and any disputes arising under it are to be brought exclusively in the United States District Court for the Eastern District of Louisiana in New Orleans. The charter specifies the types and amounts of insurance coverage to be purchased by CAL and requires that AFFI, AFL, AIL, CAL, and Ocean Marine, Limited, their shareholders, subsidiaries, and affiliates, be covered under the policy as named insureds.
Having reviewed these myriad connections between the two Cayman corporations, their agents, and their Louisiana business affiliates, we conclude that AIL and CAL are engaged in continuous and systematic contacts with the state of Louisiana. Even though Spomer's claim did not arise directly out of these contacts, they are more than sufficient to satisfy the requirements for "general" personal jurisdiction over these non-resident corporations. The most significant of these contacts are that all of the income for the Cayman corporations is generated by a Louisiana corporation, paid to a Louisiana corporation in Louisiana, and distributed to them by a Louisiana corporation pursuant to the terms of a franchise owned by a Louisiana corporation. Additionally, every aspect of the vessel's operation is controlled by the franchise document and confidential operating manual owned by a Louisiana corporation and maintained in the Louisiana office of that corporation. The Cayman corporations, through their agents, are in constant communication with personnel working in AFL's Louisiana office.
Moreover, we find that the exercise of personal jurisdiction over these defendants under the facts of this case would not offend traditional notions of fair play and substantial justice. AIL and CAL have deliberately structured their enterprise to facilitate business from United States customers by channeling that business through the Louisiana office of AFL. Louisiana has an interest in this litigation, because all of the promotional material for the dive cruises carries a Louisiana address, thus implying to potential customers and crew members that the protections of Louisiana law govern the vessels of the "Aggressor Fleet®." Additionally, Spomer has a strong interest in obtaining effective relief in this forum. She is a United *275 States citizen entitled to the procedural and evidentiary advantages involved in this country's judicial process. AIL and CAL have not presented any evidence to show that litigation of this matter in Louisiana would be a hardship. On the contrary, the two contracts under which the Cayman Aggressor III is operated specify Louisiana in their choice of law and jurisdictional provisions. CAL is a signatory to both of these contracts. Moreover, AIL's 50% owner and manager travels to Louisiana regularly on business related to the franchise and operations of Cayman Aggressor III.
When the defendant has deliberately engaged in significant activities within a state or has created continuing obligations between itself and residents of the forum, it manifestly has availed itself of the privilege of conducting business there, and because its activities are shielded by the benefits and protections of the forum's laws, it is presumptively not unreasonable to require the defendant to submit to the burdens of litigation in that forum as well. de Reyes, 586 So.2d at 106. Accordingly, we find the trial court erred in sustaining the exceptions to personal jurisdiction filed by AIL and CAL.

"NO RIGHT/NO CAUSE" OF ACTION
Louisiana's Direct Action Statute provides, in pertinent part:
B. (1) The injured person ... shall have a right of direct action against the insurer within the terms and limits of the policy; and, such action may be brought against the insurer alone, or against both the insured and insurer jointly and in solido, in the parish in which the accident or injury occurred or in the parish in which an action could be brought against either the insured or the insurer under the general rules of venue prescribed by Code of Civil Procedure Art. 42 only.
* * *
(2) This right of direct action shall exist whether or not the policy of insurance sued upon was written or delivered in the state of Louisiana and whether or not such policy contains a provision forbidding such direct action, provided the accident or injury occurred within the state of Louisiana. Nothing contained in this Section shall be construed to affect the provisions of the policy or contract if such provisions are not in violation of the laws of this state.
LSA-R.S. 22:655(B)(1) & (2). The Louisiana Supreme Court has interpreted the Direct Action Statute to mean that in order for an injured third party to sue a tortfeasor's insurer directly, either the accident or injury must have occurred in Louisiana or the policy must have been written or delivered in Louisiana. Webb v. Zurich Ins. Co., 251 La. 558, 205 So.2d 398 (1967). An exception on the ground that the Direct Action Statute is inapplicable has consistently been referred to as an exception of no right of action. Giannouleas v. Phoenix Maritime Agencies, Inc., 621 So.2d 1131, 1133 (La.App. 1st Cir. 1993).
The judgment stated that the exception of "No Right of Action/No Cause of Action" filed by Lloyds was sustained, and Spomer's case against Lloyds was dismissed. In oral reasons for judgment, the trial court stated:
On the Exception of No Right of Action filed by Lloyds of London and Institute of London Underwriter[s], I find that, of course, the accident didn't occur here in Louisiana, the policy wasn't written in Louisiana, and I also find that the policy was not delivered in Louisiana. *276 Therefore, I will grant the Exception of No Right of Action.
The court was obviously correct concerning the location of the accident upon which Spomer's claim is based. However, after a thorough review of the record in this case and jurisprudence involving Lloyds' policies, we believe the trial court may have taken too narrow a view of the facts surrounding the issuance and delivery of the Lloyds policy in this case.
The agent who obtained the vessel coverage, John F. Young, Sr., is employed by Stiel Insurance Services of New Orleans, Inc., and maintains his office in Metairie, Louisiana. Young sold insurance over the course of many years to Paul Haines, his family, and his companies. When the diving enterprise began, Haines called Young to introduce Hasson and to obtain insurance coverage for the franchise vessels.[11] Young placed coverage for Cayman Aggressor III from the time it was converted to a dive vessel. Coverage was renewed annually on the joint authority of Hasson and Haines, from whom Young would request a down payment check for the annual premium. Although the insured was shown on Young's underwriting file as AIL, sometimes the premium down payment check came from AFL.[12] The remaining premium would be financed through a finance company, which would send Young a check for the full annual premium and would collect the remaining premium payments from the insured.
After getting approval from Haines and Hasson to bind coverage, Young would call a New Orleans broker, G & M Marine, Inc. (G & M). G & M would, in turn, contact a London broker to arrange the placement of the insurance with independent underwriters there. When coverage had been obtained, G & M would generate and send Young "cover notes," showing the type and amounts of coverage for the vessel and stating who the named insureds were under the policy. The actual policy was never sent to Young or the insureds. Rather, an unexecuted "SP-23" form illustrating the basic coverage provided by the policy was attached to the "cover notes" and was sent to Young each time the policy was renewed. The "cover notes" served as the only evidence of insurance.
The parties named as insured on the "cover notes" for Cayman Aggressor III were AIL, Ocean Marine Ltd., CAL, and AFL. The "cover notes" were signed by G & M Surplus Lines below the following statement:
This document is intended for use as evidence that the insurance or reinsurance, as described herein, has been effected with Underwriters/Insurers as specified herein and shall be subject to all terms and conditions of the policy or policies which will be issued. In the event of any inconsistency herewith, the terms and provisions of such policy or policies shall prevail.
Please examine the Cover Note carefully and if cover[age] is not in accordance with your requirements or if the security *277 stated hereon is not acceptable, please advise us immediately.
There was no evidence in the record that an actual policy was ever issued or delivered to anyone. The only evidence of insurance was the "cover notes," which were generated and delivered in Louisiana.
Under Louisiana law, the entire insurance policy must be written and delivered to the insured within a reasonable time after its issuance. LSA-R.S. 22:628 & 634; Louisiana Maint. Services, Inc. v. Certain Underwriters at Lloyd's of London, 616 So.2d 1250, 1252 (La.1993). The Louisiana Supreme Court determined in the Louisiana Maintenance Services case that because Lloyds had failed to comply with the statutory requirement of delivery, it could not rely on policy exclusions. The court also assessed penalties and attorney fees for Lloyd's "misinterpretation of its undelivered policy," stating its failure to pay was "arbitrary, capricious and without probable cause." Louisiana Maint. Services, 616 So.2d at 1253. In Gulf Wide Towing, Inc. v. F.E. Wright (U.K.) Ltd., 554 So.2d 1347 (La.App. 1st Cir.1989), this court examined a similar situation involving vessel insurance, in which several persons testified that London underwriters generally do not issue policies to their insureds, only "cover notes," which represent the insurance contract and set forth the conditions of coverage. This court affirmed the trial court's judgment that this constituted sufficient proof of insurance coverage. Gulf Wide, 554 So.2d at 1352-53. In Foret v. Terrebonne Towing Co., Inc., 632 So.2d 344 (La.App. 1st Cir.1993), writ denied, 94-0734 (La.5/13/94), 637 So.2d 1067, this court again examined Lloyds' custom of issuing "cover notes" in lieu of a separate policy as evidence of excess coverage. This court rejected as "almost incredibl[e]" all of Lloyds' arguments and awarded additional attorney fees for the appeal. Foret, 632 So.2d at 348. In Heaton v. Gulf International Marine, Inc., 536 So.2d 622, 624 (La.App. 1st Cir.1988), this court noted it was undisputed that the plaintiffs injury occurred offshore beyond the territorial limits of Louisiana. However, because the record did not establish where the insurance policy was written or to whom it was delivered, the court also found the insurer had not satisfied its burden of proof on the exception of no right of action.
Grubbs v. Gulf International Marine, Inc., 625 So.2d 495 (La.1993), was a case in which the Louisiana Supreme Court responded to certification of a question of law from the United States Court of Appeals for the Fifth Circuit, and resolved the issue by holding that the Louisiana Direct Action Statute permits an injured party to maintain a direct action against a marine P & I insurer.[13] In a footnote, the court noted that the plaintiff/appellant, who was injured while employed on the vessel, also urged the court to hold that the insurer "constructively delivered" the policy to his employer by sending the policy to its New York broker and sending only certificates of insurance to the insured. He argued that the insurer's failure to deliver the policy in Louisiana was calculated to avoid the Direct Action Statute and that such conduct should not be allowed to defeat the application of the statute. Because this was not the precise legal question certified to it by the federal court, the Louisiana Supreme Court declined to address it, but did state that "on the facts presented we find Grubbs' argument *278 compelling ...." Grubbs, 625 So.2d at 497, n. 3.
We also find this argument compelling. The facts of this case show that Lloyds did not deliver a policy for Cayman Aggressor III to any of the insureds. Rather, through "cover notes" generated by a Louisiana broker, delivered in Louisiana to AFL, and sent by the Louisiana agent to AIL in the Cayman Islands, Lloyds provided evidence of coverage on the vessel. Yet these "cover notes" stated that, although they constituted evidence of insurance, the policy or policies "will be issued." Lloyds cannot use its deliberate failure to comply with Louisiana's laws requiring delivery of the policy to the insured as a defense to a direct action against it. We find that, by generating and delivering "cover notes" in Louisiana, Lloyds has constructively delivered its policies in this state. Therefore, we conclude that Spomer has a right of action against Lloyds under the Direct Action Statute.

SERVICE OF PROCESS ON NONRESIDENT DEFENDANTS
When, as in this case, jurisdiction over a non-resident is based on the Louisiana Long-Arm Statute, Louisiana Revised Statute 13:3204 sets forth the requirements for service of process. Paragraph (A) of Section 3204 provides:
A certified copy of the citation and of the petition in a suit under R.S. 13:3201 shall be sent by counsel for the plaintiff... to the defendant by registered or certified mail, or actually delivered to the defendant by commercial courier, when the person to be served is located outside of this state or by an individual designated by the court in which the suit is filed, or by one authorized by the law of the place where the service is made to serve the process of any of its courts of general, limited, or small claims jurisdiction.
The requirements of this section, namely that a certified copy of the citation and petition be sent by counsel for plaintiff to defendant by registered or certified mail or actually delivered to defendant, are mandatory. Ray v. South Central Bell Tel. Co., 315 So.2d 759, 761 (La.1975). This section has been carefully drafted to insure that Louisiana's "long arm" provisions meet the constitutional mandate of due process which requires a method of service reasonably calculated to give the defendant actual notice. When the plaintiff's counsel sends a certified copy of the citation and petition to the defendant by registered or certified mail, such service has the same legal force and validity as personal service made on the defendant within the state. There is no requirement under Section 3204 for a signed return receipt. McFarland v. Dippel, 99-0584 (La.App. 1st Cir.3/31/00), 756 So.2d 618, 622, writ denied, 00-1794 (La.9/29/00), 770 So.2d 349.
In oral reasons for judgment, the trial court stated that since it had ruled there was a lack of personal jurisdiction over CAL and AIL, the service of process was insufficient. Having found that the court does have personal jurisdiction over CAL and AIL, the issue is whether the requirements for service under the Long-Arm Statute were met. Generally, this court would simply review the record to see if it contains evidence that the citation and petition were sent to CAL and AIL by registered or certified mail, and would render judgment on the exceptions. However, possibly because of the transfer of the suit from Iberia to St. Mary Parish, the record sent to this court is incomplete. For example, the depositions in the record sent to this court are copies; most of them do not include any of the attachments. Additionally, although the record contains copies *279 of an affidavit, a registered letter, and a return receipt showing service on CAL on April 3, 1997, the originals of those documents are not in the record. Similarly, although the trial court in Iberia Parish referred in its judgment to correspondence dated September 17, 1996, and a return receipt in the record indicating service of the petition on AIL, neither those documents nor copies of them appear in the record sent to this court. In response to this court's inquiry, the clerk of court for St. Mary Parish was unable to locate any additional documents forming a part of this record.
Therefore, although it appears service may have been made on CAL and AIL in accord with Section 3204 of the Long-Arm Statute, based on the record sent to this court, we are unable to make that determination. In remanding this case, we note these discrepancies to allow the parties and the court to take whatever steps are appropriate to complete the record so the exceptions concerning insufficiency of service of process can be resolved by the district court in light of our conclusion concerning personal jurisdiction.

CONCLUSION
The portions of the judgment appealed are reversed and the case is remanded for further proceedings consistent with this opinion. All costs of this appeal are assessed against Cayman Aggressor, Ltd., Aggressor International, Ltd., and Certain Underwriters of Lloyds, London.
REVERSED AND REMANDED.
NOTES
[1] Judge Ian W. Claiborne, retired from the Eighteenth Judicial District Court, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] The correct name of this defendant is Aggressor International, Ltd.
[3] The exception filed on behalf of the underwriters lists a number of companies and individuals, some of whom are generally referred to in the judgment as Institute of London Underwriters and others as Certain Underwriters of Lloyds, London. For ease of description, we will refer to all of the underwriters as Lloyds.
[4] The franchisor for the "Aggressor" fleet of vessels is also a Louisiana corporation, Aggressor Fleet Franchising, Inc. (AFFI), which is owned by Jill Haines and AFL and has the same address as AFL.
[5] Wayne Ray Hasson, Jr., a Cayman resident, owns 50% of AIL; other details of its ownership are protected by the confidentiality laws of the Cayman Islands. All of AIL's business is conducted by Hasson, with clerical assistance from his wife.
[6] CAL's shareholders are Paul Haines, who owns 20%; Burns Rutty, a Cayman resident who owns 60%, and Hasson, who owns 20%. It is a "local" Cayman corporation, which does not enjoy the same degree of confidentiality as the other Cayman corporations involved in this case. Although Rutty is its "managing director," Hasson oversees the day-to-day operations of CAL.
[7] Ocean Marine, Ltd. is a Cayman corporation. Its ownership is shielded under the confidentiality laws of the Cayman Islands. However, its agent is Hasson; all of its activities are conducted by him.
[8] The court made this ruling as a precautionary measure, being uncertain as to whether this exception, as well as the others, had been re-urged by the parties after the remand from the supreme court.
[9] This 133-page manual covers such minutiae as the type of clothing to be worn by the crew when guests arrive, the recommended adult games for guests (cards and Trivial Pursuit), a prohibition against playing any loud music on board at any time, and a requirement that each passenger cabin have a complimentary gift package worth at least $3.00. It also specifies in great detail such more important criteria as the qualifications and duties of captain and crew, the vessel specifications and equipment, and the diving procedures to be used by the crew and guests.
[10] These percentages are shown in the franchise agreement. Jill Haines and Hasson testified in depositions that the actual distribution is 31% to AFL and 69% to CAL.
[11] It is not clear whether Young sold coverage for all the "Aggressor Fleet®" vessels, but the insurance "cover notes" show at least two other vessels were also covered through him by Lloyds.
[12] Young's file and the documents prepared by and for his agency concerning the vessel insurance showed the address of AIL as Post Office Drawer K, Morgan City, Louisiana, which was AFL's mailing address. The company handling the premium financing also used the Morgan City address for AIL. According to Young, the only reason AIL was shown as the insured on his underwriting file was because AIL was the first insured listed on the "cover notes" evidencing insurance for Cayman Aggressor III.
[13] The Louisiana appellate courts had reached disparate conclusions on this question of law, and the Grubbs decision resolved the issue in accord with this court's decision in Giannouleas, 621 So.2d 1131.