836 So.2d 333 (2002)
Shirley Autin EUSEA
v.
Roger J. BLANCHARD, Jr., M.D., et al.
No. 2001 CA 2229.
Court of Appeal of Louisiana, First Circuit.
December 20, 2002.
Writ Denied March 28, 2003.
*334 A. Remy Fransen, Jr., P. Chris Christofferson, Fransen & Hardin, New Orleans, for Plaintiff-Appellant Shirley Autin Eusea.
C. Wm. Bradley, Jr., Nicole Duarte Martin, Lemle & Kelleher, L.L.P., New Orleans, for Defendant-Appellee Broadlawns Medical Center.
Before: PARRO, JAMES, and PATTERSON, JJ.[1]
*335 PARRO, J.
In this medical malpractice suit, Shirley Autin Eusea appeals a judgment sustaining a declinatory exception raising the objection of lack of personal jurisdiction in favor of Broadlawns Medical Center (Broadlawns), a teaching hospital in Des Moines, Iowa, and dismissing it from the suit. We reverse and remand.

FACTUAL AND PROCEDURAL BACKGROUND
On September 19, 1995, Eusea went to Ochsner Family Doctor Clinic (Ochsner) in Mathews, Louisiana, and was examined by Dr. Roger J. Blanchard. Dr. Blanchard was a third-year resident at Broadlawns who was participating in a "preceptorship," a voluntary program at Broadlawns that allowed residents to acquire practical experience in a setting and location of their choice. After examining Eusea, Dr. Blanchard diagnosed her condition as mononucleosis. However, Eusea actually had a strep throat, but no throat culture was done and no broad-spectrum antibiotic was prescribed. Five days later, she was admitted to the emergency room at St. Anne General Hospital (St. Anne) with septicemia. This led to septic shock and gangrene of her extremities and ultimately required the amputation of both arms below the elbows and both legs below the knees.
Eusea filed a claim against St. Anne and Ochsner with the Louisiana Patient's Compensation Fund, and amended it to add Dr. Blanchard and his malpractice insurer, Medical Protective Company (MPC). After learning through discovery in that proceeding about Dr. Blanchard's involvement in her treatment, she also filed a petition for damages in the Seventeenth Judicial District Court (17th JDC), naming as defendants Dr. Blanchard and St. Paul Fire & Marine Insurance Company (St. Paul), whose policy provided coverage as the excess liability insurer of Broadlawns.[2] In its answer, St. Paul admitted that when he was involved in the preceptorship, Dr. Blanchard was insured under a policy of insurance issued by St. Paul to Broadlawns.[3]
On January 22, 2001, Eusea filed a second supplemental and amending petition, naming Broadlawns as an additional defendant and asserting vicarious liability claims against it, as Dr. Blanchard's employer. Broadlawns responded by filing a declinatory exception raising the objection of lack of personal jurisdiction. After an evidentiary hearing on July 5, 2001, the court sustained the exception and dismissed *336 Broadlawns from the suit without prejudice. A judgment to this effect was signed on July 10, 2001. It is from this judgment that Eusea appeals, claiming the trial court erred in concluding Broadlawns had insufficient contacts with the state of Louisiana for the court to assert personal jurisdiction over it.

APPLICABLE LAW
Appellate courts conduct a de novo review of the legal issue of personal jurisdiction over a nonresident by a Louisiana court. Griffith v. French, 97-2635 (La.App. 1st Cir.12/28/98), 723 So.2d 1140, 1142, writ denied, 99-0220 (La.3/19/99), 740 So.2d 116. Under Louisiana's long-arm statute, a court of this state may exercise personal jurisdiction over a nonresident on any basis consistent with the Louisiana Constitution and the Constitution of the United States. See LSA-R.S. 13:3201(B). Therefore, the limits of the Louisiana long-arm statute and of constitutional due process are coextensive, and the sole inquiry into jurisdiction over a nonresident is a one-step analysis of the constitutional due process requirements. Ruckstuhl v. Owens Corning Fiberglas Corp., 98-1126 (La.4/13/99), 731 So.2d 881, 885; Spomer v. Aggressor Int'l, Inc., 00-1646 (La.App. 1st Cir.9/28/01) 807 So.2d 267, 271, writ denied, 01-2886 (La.1/25/02), 807 So.2d 250.
The due process test requires that in order to subject a nonresident defendant to a personal judgment, the defendant must have certain minimum contacts with the forum state, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. International Shoe Co. v. State of Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945); de Reyes v. Marine Mgmt. & Consulting, Ltd., 586 So.2d 103, 105 (La.1991). In interpreting the due process clause, the United States Supreme Court has recognized a distinction between two types of personal jurisdiction"general" and "specific." A state exercises general jurisdiction when the defendant's contacts with the state are not related to the lawsuit. Specific jurisdiction, on the other hand, is exercised when the suit arises out of or is related to the defendant's contacts with the forum. Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414, nn. 8 & 9, 104 S.Ct. 1868, 1872, nn. 8 & 9, 80 L.Ed.2d 404 (1984); Verdin v. Morania Oil Tanker Corp., 94-0916 (La.App. 1st Cir.5/5/95), 655 So.2d 542, 543, writ denied, 95-1402 (La.9/15/95), 660 So.2d 453. The two-part minimum contacts/fairness analysis applies to the assertion of specific as well as general jurisdiction. de Reyes, 586 So.2d at 109.
When a forum seeks to exercise specific jurisdiction over an out-of-state defendant who has not consented to suit there, the requirement of meaningful minimum contacts is satisfied when the defendant has purposefully directed his activities at residents of the forum and the litigation results from alleged injuries arising out of or related to those activities. de Reyes, 586 So.2d at 106. When the cause of action, however, does not arise out of the defendant's purposeful contacts with the forum, due process requires that the defendant be engaged in continuous and systematic contact to support the exercise of general jurisdiction. A & L Energy, Inc. v. Pegasus Group, 00-3255 (La.6/29/01), 791 So.2d 1266, 1271. Contacts may be effected by mail and electronic communication, as well as physical presence. Spomer, 807 So.2d at 271-72.
As previously noted, the test has evolved into a two-part test, the first part being the "minimum contacts" prong, which is satisfied by a single act or actions by which the defendant "purposefully *337 avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." Ruckstuhl, 731 So.2d at 885, citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985), and Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958). The nonresident's "purposeful availment" must be such that the defendant should "reasonably anticipate being haled into court in the forum state." Ruckstuhl, 731 So.2d at 885, citing World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980).
In determining the fundamental fairness part of the test, the court must examine (1) the defendant's burden; (2) the forum state's interest; (3) the plaintiff's interest in convenient and effective relief; (4) the judicial system's interest in efficient resolution of controversies; and (5) the state's shared interest in furthering fundamental social policies. Asahi Metal Industry Co., Ltd. v. Superior Court of California, Solano County, 480 U.S. 102, 113, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987).

ANALYSIS
With these precepts in mind, we examine the record to determine whether Broadlawns had sufficient contacts with this state, such that the exercise of jurisdiction over it would not offend traditional notions of fair play and substantial justice. The record includes a copy of the "Notice of Appointment and Contract" between Broadlawns and Dr. Blanchard, which outlines the terms of his residency beginning July 1, 1993, and ending June 30, 1996. In that contract, he agreed to perform the duties of a resident under the general supervision of the director of medical education or designee, to meet certain responsibilities, and to maintain specified standards and requirements. In return, Broadlawns agreed to pay him an annual salary and to provide, among other things, malpractice insurance
for the Resident for all duties associated with the duties required of the Resident under this contract and which are a part of the educational aspect of the residency program at [Broadlawns], for duties and training performed at [Broadlawns] or elsewhere.
* * *
[Broadlawns] is not responsible for and will not provide medical malpracatice (sic) insurance coverage for the Resident performing duties or services which are not a part of the residency program at [Broadlawns], except as referenced ... above.
The parties filed a written stipulation that at the time Eusea's claim was made, Broadlawns was self-insured for $250,000 per loss or $500,000 per annum aggregate, and was also covered under a policy of excess claims-made insurance issued by St. Paul, "which policy covered [Dr. Blanchard] for any acts of alleged malpractice on September 19, 1995[,] at the family practice clinic in Mathews, LA." A certified copy of the St. Paul policy is also in the record.
The record also contains a July 27, 1995 letter from Dr. Larry D. Beaty, director of the family practice residency program at Broadlawns, to Dr. Michael J. Marcello, a physician with Ochsner, to confirm the arrangements regarding Dr. Blanchard's preceptorship from September 11-24, 1995. The letter explained that:
Preceptorships are part of the educational process for our residents. During this time, they are exposed to private medical practice and learn more about the function of an office. A copy of the objectives is enclosed. Upon completion of the rotation, you will be *338 asked to complete an evaluation form regarding the experience.
* * *
Dr. Blanchard is licensed to practice medicine in Louisiana and has a Federal DEA certificate. You may schedule patients to see him. We find that our residents are able to handle 75%80% of the workload of an experienced practitioner. We ask that someone be present at all times so that he will be able to consult as needed. Any revenues generated are for the benefit of your office, as we do not allow our residents to be paid for their services. Broadlawns will continue to pay the stipend. It is acceptable to make a donation to the Broadlawns Foundation to help with the stipend if desired.
Dr. Blanchard is covered by Louisiana Professional Liability Insurance and Broadlawns' Professional Liability Insurance will cover his medical activities while with your office.
Please send a letter stating your willingness to have Dr. Blanchard with you to satisfy our accreditation requirements.
Dr. Marcello responded to Broadlawns in a letter dated August 8, 1995, agreeing to have Dr. Blanchard complete a third-year preceptorship with him.[4]
A copy of the first page of Broadlawns' "Preceptorship Objectives and Guidelines" is also in the record. It explains that preceptorships "are offered to second and third-year family practice residents as a means of presenting opportunities for education and preparation for future practice which are not readily obtainable on the Broadlawns campus." It further states that Broadlawns continues to pay the resident's stipend, to provide malpractice coverage during the preceptorships, and to pay any fees required to practice medicine or prescribe medications in Iowa. However, it clarifies that "[a]ny such fees required for out-of-state preceptorships are the responsibility of the resident and/or sponsoring physician."
Dr. Blanchard's deposition is also in the record. It reveals that he was born and raised in Louisiana, graduated in 1989 from Nicholls State University in Thibodaux, received his doctor of medicine degree in 1993 from Louisiana State University School of Medicine in New Orleans, and served a three-year family practice residency with Broadlawns in Iowa from 1993 through 1996. After completing that program, he returned to Louisiana to practice medicine, as he had always intended. He said he chose Broadlawns because a friend told him it was the Des Moines "equivalent of Charity Hospital in New Orleans," with "lots of volume, lots of indigents, lots of very sick patients." In addition to the preceptorship at Ochsner, he had participated in two other preceptorships in family practice clinics in Louisiana. Concerning these preceptorships, Dr. Blanchard explained:
[I]n residency we are given some leeway with a few rotations where we may elect to do electives outside of the structure of the actual physical Broadlawns Medical Center or that residency itself. I askedI had a phone call with Dr. Marcello and I asked him if it would be okay if I came to do a family practice preceptorship for two weeks here, and at that [point,] it became Dr. Marcello and Dr. Larry [Beaty] who was the director at that time ... not of Broadlawns Medical Center, of the residency training portion of the medical center.
After reviewing all of the points of contact between Broadlawns and Louisiana, *339 we conclude that the constitutional requirement of minimum contacts has been met. Broadlawns made a program available to its second and third-year residents to provide them with opportunities for education and preparation for future practice that were "not readily obtainable on the Broadlawns campus." The preceptorships thus formed part of the experience that Broadlawns provided to its residents, even though that experience occurred in other locations. While Broadlawns argues that this program served only its residents, the availability of such practice opportunities would help attract the best and brightest young doctors to Broadlawns for their residencies. The statement of objectives makes it clear that Broadlawns contemplated that some of its residents would choose preceptorships with medical facilities outside of the state of Iowa; those residents or their sponsors would be responsible for any out-of-state licenses or fees. As a matter of fact, Dr. Blanchard participated in three separate preceptorships in the state of Louisiana, one of which ultimately led to this litigation.
While participating in those programs, Dr. Blanchard was an employee of Broadlawns, which continued to pay him a stipend while he practiced medicine in the state of Louisiana. Broadlawns knew that its employees would be practicing medicine in states other than Iowa and that these activities might subject their residents to malpractice claims in those states. As Dr. Blanchard's employer, Broadlawns could reasonably anticipate that respondeat superior claims would be asserted against it if his activities in Louisiana caused or were alleged to cause injuries to a patient seeking medical treatment from him there. Such claims would generally involve being "haled into" a Louisiana court, and indeed, Broadlawns did anticipate this possibility and provided its residents with malpractice insurance coverage for their activities while practicing in states other than Iowa. The availability of this coverage served to protect Broadlawns and its residents, as well as the out-of-state doctors, clinics, and hospitals who agreed to be preceptorship sponsors. Absent this preceptorship program and the incentives offered by Broadlawns, Dr. Blanchard would not have been practicing medicine in Louisiana as a resident. This litigation results from injuries arising out of or related to Broadlawns' activities that were directed toward Louisiana.
Moreover, in order to effectuate Dr. Blanchard's choice, Broadlawns furnished his prospective sponsor with written information about its program. The preceptorship documents make it clear that Broadlawns delegated its direct supervisory responsibility as Dr. Blanchard's employer to the sponsoring health care provider, its "designee," who was required to agree to supervise Dr. Blanchard while he practiced in Louisiana. Broadlawns requested that agreement in writing, and received it from Dr. Marcello on behalf of Ochsner. Broadlawns also asked the sponsoring physician to provide it with an evaluation of the resident's services at the conclusion of the preceptorship, information that would inure to the benefit of the resident and Broadlawns. However, the record does not indicate whether such an evaluation was forthcoming in this case.
Broadlawns' communication with Dr. Marcello also contained a not-so-subtle solicitation for financial assistance for its preceptorship program. Dr. Beaty's letter indicated that, although Dr. Blanchard's salary during the preceptorship would be paid by Broadlawns, it would be "acceptable" for the sponsor to "make a donation to the Broadlawns Foundation to help with the stipend if desired." This suggestion is *340 a direct request for monetary support from the Louisiana sponsor.
The totality of these contacts between Broadlawns and Louisiana convinces us that Broadlawns "purposefully availed itself of the privilege of conducting activities within the forum state," both directly, through its contacts with Dr. Marcello, and indirectly, through its employee, Dr. Blanchard. The nature and extent of those activities were such that it could and did "reasonably anticipate being haled into court in the forum state," and protected itself by purchasing excess liability coverage for medical malpractice that was applicable to its resident's activities, as long as the resident was performing duties or services that were a part of the residency program. Because the preceptorship was part of Broadlawns' residency program, this coverage extended to the performance of those services in Louisiana.
Having determined that the "minimum contacts" prong of the constitutional requirements was met in this case, we have no difficulty concluding that the maintenance of the suit in Louisiana does not offend traditional notions of fundamental fairness. Broadlawns is represented in Louisiana by lawyers who are also defending Dr. Blanchard and St. Paul. Technology now enables extensive discovery, including depositions, to be conducted without requiring the parties to travel from one jurisdiction to another. Therefore, Broadlawns will not be unduly burdened by defending the suit in Louisiana. Certainly, it is vastly more convenient for the severely-injured Louisiana plaintiff to litigate here, and virtually all of the evidence relative to her claim will be developed in Louisiana, where the alleged malpractice occurred. Louisiana has an interest in protecting its citizens and in applying its medical malpractice laws to effectuate what it has determined is a reasonable balancing of interests between the injured party, the responsible party or parties, and the state's compensation programs. By enabling Dr. Blanchard to practice medicine in Louisiana during his three preceptorships, Broadlawns exposed itself to the pitfalls inherent in those activities and can reasonably be required to defend itself in a Louisiana court when injury arising out of those activities occurred in this state and affected a Louisiana resident.

CONCLUSION
Based on the foregoing, we reverse the judgment of the district court and remand this matter for further proceedings. All costs of this appeal are assessed to Broadlawns.
REVERSED AND REMANDED.
NOTES
[1] Judge A. Clayton James, retired from the Twenty-Second Judicial District Court, and Michael A. Patterson are serving as judges pro tempore by special appointment of the Louisiana Supreme Court.
[2] In this suit, Eusea asserted that Dr. Blanchard was not a Louisiana qualified health care provider, so neither he nor St. Paul were entitled to the protection of the limits of liability in the Louisiana Medical Malpractice Act. St. Paul then filed a declaratory judgment action in the Nineteenth Judicial District Court (19th JDC), seeking to have Dr. Blanchard declared a qualified health care provider, so St. Paul could get the benefit of the liability limits. The trial court in that suit limited Dr. Blanchard's liability to $100,000, because he had filed proof of financial responsibility in the form of his malpractice policy with MPC. This court affirmed that portion of the judgment, but held on rehearing that Dr. Blanchard's status as a qualified health care provider did not entitle St. Paul, as Broadlawns' excess insurer, to the benefit of the limitation. St. Paul Fire and Marine Ins. Co. v. Eusea, 99-2117 (La.App. 1st Cir.12/29/00), 775 So.2d 32, writs denied, 01-0472 and 01-0536 (La.4/27/01), 791 So.2d 116 and 791 So.2d 117.
[3] Eusea later amended her petition in this suit to add as defendants Dr. Michael J. Marcello, Dr. Jack Heidenreich, and Ochsner. An intervention was filed by the State of Louisiana, through the Department of Health and Hospitals, for amounts paid for Eusea's care under the Medicaid program. None of these claims affect the issues in this appeal.
[4] In briefs and oral argument, both parties also referred to a telephone call that apparently was made to Dr. Marcello concerning Dr. Blanchard's preceptorship.