STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

15-226


HUEY LEGER, ET UX.

VERSUS

ICL AMERICA LIMITED, ET AL.


**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF ACADIA, NO. 2010-11106
HONORABLE MARILYN C. CASTLE, DISTRICT JUDGE

**********

JIMMIE C. PETERS
JUDGE

**********

Court composed of Jimmie C. Peters, Billy Howard Ezell, and Shannon J. Gremillion, Judges.


REVERSED AND REMANDED.


David R. Frohn
David R. Frohn, LLC
2201 Lake Street, Suite 106
Lake Charles, LA 70601-7199
(337) 419-1929
COUNSEL FOR PLAINTIFFS/APPELLANTS:
    Gwen Leger
    Huey Leger

**Russell K. Zaunbrecher**
**Brett A. Stefanski**
**Edwards, Stefanski & Zaunbrecher**
**P.O. Drawer 730**
**Crowley, LA 70527-0730**
**(337) 783-7000**
**COUNSEL FOR PLAINTIFFS/APPELLANTS:**
 **Gwen Leger**
 **Huey Leger**

**Heather S. Duplantis**
**Gregory T. Stevens**
**Jack B. Stanley**
**Frederick S. Kaiser**
**Alex J. Velazquez**
**Phelps Dunbar LLP**
**P. O. Box 4412**
**Baton Rouge, LA 70821-4412**
**(225) 346-0285**
**COUNSEL FOR DEFENDANT/APPELLANT:**
 **ICL America Limited**

**Joseph S. Sano**
**Prince, Lobel, Tye, LLP**
**100 Cambridge Street, Suite 2200**
**Boston, MA 02114**
**(617) 456-8000**
**COUNSEL FOR DEFENDANT/APPELLANT:**
 **ICL America Limited**

**Christopher H. Hebert**
**Rabalais & Hebert, LLC**
**701 Robley Drive, Suite 210**
**Lafayette, LA 70503**
**(337) 981-0309**
**COUNSEL FOR DEFENDANT/APPELLANT:**
 **Burlington Insurance Company**

**Paul N. Vance**
**Jedd S. Malish**
**Baldwin, Haspel, Burke & Mayer, LLC**
**Energy Centre, Suite 3600**
**1100 Poydras Street**
**New Orleans, LA 70163**
**(504) 569-2900**
**COUNSEL FOR DEFENDANT/APPELLEE:**
 **International Conveyors Limited**

**David T. Butler, Jr.**
**Funderburk & Butler**
**1111 South Foster Drive, Suite G**
**Baton Rouge, LA 70806**
**(225) 924-1000**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **Bridgefield Casualty Insurance Company, Inc.**

**Keith W. McDaniel**
**Quincy T. Crochet**
**Heather M. Nagel**
**McCranie, Sistrunk, Anzelmo, Hardy, McDaniel & Welch LLC**
**195 Greenbriar Boulavard, Suite 200**
**Covington, LA 70433**
**(504) 831-0946**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
    **Southern Vanguard Insurance Company**
    **D.E. Shipp Belting Company**

**PETERS, J.**

The husband-and-wife plaintiffs, Huey and Gwen Leger, brought this personal injury action against a number of defendants to recover damages they sustained[1] when a conveyor belt, manufactured by International Conveyors Limited (International Conveyors), ripped apart and struck Mr. Leger. The Legers and two of the defendants, ICL America Limited (ICL America) and The Burlington Insurance Company (Burlington Insurance), appeal the trial court's grant of a declinatory exception of lack of personal jurisdiction over International Conveyors, dismissing the Legers' claims against that defendant. For the following reasons, we reverse the trial court's grant of the exception and remand the matter to the trial court for further proceedings.

## DISCUSSION OF THE RECORD

Mr. Leger sustained his personal injuries on March 3, 2010, while installing a new conveyor belt at Peoples Moss Gin Plant (Peoples Moss Gin) in Palmetto, Louisiana. At the time of the accident, Mr. Leger worked for Rice Belt Distributors, Inc. (Rice Belt), a Louisiana corporation, whose principal business is the installation of grain equipment throughout South Louisiana. Peoples Moss Gin hired Rice Belt to replace an eighty-foot vertical conveyor belt in its grain elevator with a new conveyor belt. International Conveyors, an Indian company, manufactured the conveyor-belt material from which the new belt was cut, and sold that material to D.E. Shipp Belting Company (Shipp Belting) using ICL America as an intermediary in the transaction. Shipp Belting's offices are in Waco, Texas, and it is a regional distributor of, among other products, conveyor belting

---

[1] Mrs. Leger seeks to recover consortium damages she sustained as a result of the injuries to her husband.

for nearly all industries, including agriculture. ICL America is a New York wholesaler of conveyor belt products.

Rice Belt retained the services of H. Brown Cranes & Rigging, Inc. (Brown Cranes) to provide a crane and crane operator for the job; and as the crane lifted the new conveyor belt into place, the belt ripped apart and fell on Mr. Leger and a co-worker. The Legers brought suit against a number of defendants,[2] including ICL American, Shipp Belting, International Conveyors, and Brown Cranes.[3]

The matter now before us involves the trial court's grant of International Conveyors' declinatory exception of lack of personal jurisdiction, thereby dismissing that defendant from the litigation. The trial court rendered the judgment on the exception on September 2, 2014, and executed a written judgment to that effect on September 10, 2014. Thereafter, the Legers, ICL America, and Burlington Insurance[4] perfected separate appeals. The only issue raised in all three appeals is whether the trial court properly granted the exception of lack of personal jurisdiction.

**OPINION**

The declinatory exception of lack of personal jurisdiction over the person of a defendant is provided for in La.Code Civ.P. art. 925(A)(5). The party asserting that jurisdiction is proper, and not the party raising the exception, bears the initial

---

[2] Liability insurers of these various defendants were added as defendants in the litigation. Additionally, some of the defendants were added in filings subsequent to the Legers' original petition.

[3] The liability of Brown Cranes and its insurer was the subject of a prior opinion of this court. In that opinion, this court affirmed the trial court's grant of a summary judgment dismissing Brown Cranes and its insurer from the litigation. *Leger v. ICL America Limited*, 13-1334, pp. 1-3 (La.App. 3 Cir. 4/2/14) (unpublished opinion). In that opinion, this court set forth the particulars of the accident giving rise to this litigation, and our summary of the background is a partial adaption of the finding of the prior panel. Causation is not an issue in this appeal.

[4] Suit was brought against Burlington Insurance in its capacity as the liability insurer of ICL America.

2

burden of proof. *Hillman v. Griffin*, 13-648 (La.App. 3 Cir. 12/11/13), 128 So.3d 661. However, if the party with the initial burden of proof establishes the existence of minimum contacts between the opposing party and the forum, a presumption arises that jurisdiction is reasonable. *Id.* The burden then shifts to the party raising the exception to establish that the exercise of personal jurisdiction in the case would offend the traditional notions of fair play and substantial justice. *Id.*

The standard of review applied by an appellate court to the trial court's legal ruling on the issue of personal jurisdiction is de novo. *Park W. Children's Fund, Inc. v. Trinity Broad. Network, Inc.*, 13-444 (La.App. 3 Cir. 10/16/13), 156 So.3d 682. However, the trial court's factual findings are reviewed pursuant to the manifest error standard. *Id.*

At the hearing on the exception, the trial court did not place the initial burden on the Legers. Instead, as the hearing began, the trial court stated to counsel for International Conveyors, "[I]t's your motion, so if you would make your initial offerings, and then we'll let the other parties make their offerings as well." In response to the trial court's instruction, counsel for International Conveyors offered and introduced into evidence "all the exhibits attached to [its] exception and reply brief[.]" Counsel for the Legers then offered and introduced into evidence seventeen exhibits, some of which were duplicates of documents introduced by International Conveyors. At the completion of oral argument, the trial court entered judgment for International Conveyors with the following oral reasons:

> And the Court finds in this case that, while International [Conveyors] had a product that ended up here in the state of Louisiana, and, therefore, there can be said that the product was somehow in the stream of commerce, without more, that is not an act of the defendant purposely directed toward the forum state.

3

And so there needs to be additional indication that International [Conveyors] took action – actively took action to do business within the state of Louisiana. And the Court finds that the record is devoid of such additional facts.

As I've said several times today, the exercise of personal jurisdiction cannot be made under the circumstances that would offend traditional notions of fair play and substantial justice.

In this case, the Court finds that the exercise of personal jurisdiction over International [Conveyors] would, in fact, be violative of those principals, due to the fact that International [Conveyors] did not, based on the record, take any action directly to avail itself of this forum state or to take advantage of any of the protections of the state so as to have subjected itself to being haled into court here. And so the Court is going to grant the exception of lack of personal jurisdiction.

The supreme court set forth the law relative to personal jurisdiction issues in

*Southeast Wireless Network, Inc. v. U.S. Telemetry Corp.*, 06-1736, pp. 3-6 (La.

4/11/07), 954 So.2d 120, 124-25 (alteration in original), wherein it stated:

The Louisiana long-arm statute, La. R.S. 13:3201, provides for the exercise of personal jurisdiction over a nonresident defendant:

A. A court may exercise personal jurisdiction over a nonresident, who acts directly or by an agent, as to a cause of action arising from any one of the following activities performed by the nonresident:

(1) Transacting any business in this state.

(2) Contracting to supply services or things in this state.

(3) Causing injury or damage by an offense or quasi offense committed through an act or omission in this state.

(4) Causing injury or damage in this state by an offense or quasi offense committed through an act or omission outside of this state if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives revenue from goods used or consumed or services rendered in this state.

4

B.  In addition to the provisions of Subsection A, a court of this state may exercise personal jurisdiction over a nonresident on any basis consistent with the constitution of this state and of the Constitution of the United States.

Subsection B was added in 1987 to ensure that jurisdiction under the long-arm statute extended to the limits allowed by due process.  Official Comments, Acts 1987, No. 418.  In *Fox v. Board of Supervisors of Louisiana State University and Agricultural and Mechanical College*, 576 So.2d 978 (La.1991), this Court stated that "[s]ince the 1987 amendment to LSA-R.S. 13:3201, the sole inquiry in Louisiana into jurisdiction over a nonresident is whether the assertion of jurisdiction complies with constitutional due process. (citation omitted)  The limits of the Louisiana long arm statute and the limits of constitutional due process are coextensive and therefore, if the assertion of jurisdiction meets the constitutional requirements of due process the assertion of jurisdiction is authorized under the long arm statute." *Fox*, 576 So.2d at 983.

This due process requirement has evolved into a two-part test.  In order to subject a nonresident defendant to personal jurisdiction, the defendant must have certain minimum contacts with the forum state such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945); *de Reyes v. Marine Mgt. and Consulting*, 586 So.2d 103 (La.1991).

The "minimum contacts" prong is satisfied by a single act or actions by which the defendant "purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985).  This "purposeful availment" must be such that the defendant "should reasonably anticipate being haled into court" in the forum state. *Ruckstuhl v. Owens Corning Fiberglas Corporation*, 1998-1126 (La.4/13/99), 731 So.2d 881, *cert. denied*, 528 U.S. 1019, 120 S.Ct. 526, 145 L.Ed.2d 407 (1999).  This part of the test ensures that the defendant will not be haled into a jurisdiction solely as a result of a random, fortuitous or attenuated contact, or by the unilateral activity of another party or a third person. *de Reyes*, 586 So.2d at 106; *Alonso v. Line*, 2002-2644 (La.5/20/03), 846 So.2d 745, *cert. denied*, 540 U.S. 967, 124 S.Ct. 434, 157 L.Ed.2d 311 (2003).  If the defendant deliberately engages in significant activities within a state, or creates continuing obligations between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there.  Because his activities are shielded by the benefits and protections of the forum's laws, it is presumptively not unreasonable to require the defendant to submit to the burdens of litigation in that forum. *de Reyes*, 586 So.2d at 106.

The second part of the due process test centers around the fairness of the assertion of jurisdiction. Once minimum contacts are established, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with "fair play and substantial justice." *Burger King Corp.*, 471 U.S. at 476, 105 S.Ct. at 2184. Thus, once the plaintiff meets his burden of proving minimum contacts, "a presumption of reasonableness of jurisdiction arises" and "the burden then shifts to the opposing party to prove the assertion of jurisdiction would be so unreasonable in light of traditional notions of fair play and substantial justice as to overcome the presumption of reasonableness created by the defendant's minimum contacts with the forum." *de Reyes*, 586 So.2d at 107. In determining this fundamental fairness issue, the relevant considerations are: (1) the defendant's burden; (2) the forum state's interest; (3) the plaintiff's interest in convenient and effective relief; (4) the judicial system's interest in efficient resolution of controversies; and (5) the state's shared interest in furthering fundamental social policies. *Ruckstuhl*, 731 So.2d at 890.

In its exception, International Conveyors asserted that it lacked minimum contacts with Louisiana and that any attempt by a Louisiana court to exercise personal jurisdiction over it would offend traditional notions of fair play and substantial justice.

International Conveyors was created under the laws of the nation of India in 1973, and is a publicly traded company on the Bombay and Calcutta stock exchanges. The company's registered office is located in Kolkata, India, and it manufactures PVC FRAS[5] solid-woven conveyor belts in its manufacturing plants, also located in India. The conveyor belting it produces is used extensively in both the mining industry and in surface industries requiring conveyor belts to handle their materials. International Conveyors sells its products both domestically and internationally and prides itself on having the single-largest manufacturing plant for PVC belting in the world.

International Conveyors' original market for its manufactured products was primarily domestic. However, when that market became stagnant, the company

---

[5] FRAS stands for fire-resistant and anti-static.

looked to the international market, and particularly North America, for its future growth. International Conveyors began selling belting to distributers in the United States in 2002, and its year-end reports for its fiscal years 2004-2005[6] through 2010-2011, establish the beginnings and the positive result of that shift toward the international market. International Conveyors acquired both international and United States certificates for the marketing of its conveyor belting in the greater market; and in 2005, it became registered with Dun and Bradstreet and retained Witeck Consultants, Inc., a New York marketing firm, to function as intermediary between it and its American and Canadian customers.

Copies of purchase orders and invoices of International Conveyors' sales to the United States between FY 2002-03 and FY 2009-10,[7] reflect the expansive nature of International Conveyors' activities in the continental United States. During that period of time, International Conveyors shipped its manufactured products from the port at Mumbai, India, through twelve United States ports,[8] and supplied distributors in thirteen different states,[9] who in turn sold the belting to customers located in twenty states.[10] Thus, between 2002 and Mr. Leger's 2010 accident, International Conveyors used the ports of eight states to introduce its products into the United States, and supplied distributors in thirteen states, who in

---

[6] International Conveyors' fiscal year begins on April 1 and ends on March 31 of the following year.

[7] FY 2009-10 is the fiscal year in which Mr. Leger's accident occurred.

[8] These included ports in Virginia, South Carolina, New Jersey, New York, California, Texas, Oregon, and Georgia.

[9] These states were Georgia, Missouri, Kansas, Iowa, New Jersey, New York, Kentucky, Arkansas, California, Oregon, North Carolina, Florida, and Virginia.

[10] These states were Kansas, Iowa, Missouri, Georgia, Texas, Kentucky, Arkansas, California, Michigan, Oregon, North Carolina, Florida, Pennsylvania, New Mexico, New York, Ohio, Wyoming, Colorado, Virginia, and Tennessee.

turn sold to customers in twenty states, without any knowledge of, or concern for, the ultimate markets these distributors and customers would serve.

Up until March of 2005, International Conveyors sold its conveyor belting products directly to distributors in the United States. However, beginning in April of 2005, International Conveyors began servicing almost all of its United States market through ICL America, a New York company formed by Aamer Hussain, the son of Anver Hussain, a director and member of International Conveyors' Board of Directors. Aamer Hussain is a native of India, who attended college in this country and never left. After graduating from college, he worked for a bank for a while, but in 2003, he decided to form ICL America and become a wholesaler of conveyor belting. Two years later, all of International Conveyors' United States business was being funneled through ICL America.

This arrangement was apparently profitable for both International Conveyors and ICL America because in early 2010, International Conveyors was reporting a forty percent increase in its net income. A January 25, 2010 press release suggested that this increase was because "[s]upply of belting has gone up by 35%" and "[i]mproved price realizations because of higher strength belting supplied to the North American markets."[11] In the press release, R.K. Dabriwala, International Conveyors' managing director, commented that "[a]long with maintaining our growth momentum in the domestic market, we have made a conscious effort to grow internationally and have been successful *especially in the North American markets*." (Emphasis added.)

Despite the extent of International Conveyors' involvement in the United States market, as of the time of Mr. Leger's accident, it had never directly

---

[11] According to the press release, its net profit expressed in rupees, the currency of India, was "at Rs. 233.8 million from Rs. 167.0 million."

8

conducted any business in Louisiana.[12] At the same time, however, the evidence established that because of International Conveyors extensive business interests throughout the United States, it should have recognized that the appearance of its product in Louisiana was not a random, fortuitous or attenuated event, and that in supplying distributors across the United States, it was not limiting the use of its product to the domicile states of the distributors.

One of the long-time sources supplying Louisiana with conveyor belting products is Shipp Belting, who supplied the International Conveyors' conveyor-belting material at issue in this litigation. Shipp Belting supplies a six-state area from its Waco, Texas headquarters, with one of those states being Louisiana;[13] and Rice Belt had been a Shipp Belting customer since at least 1971. Additionally, Gregory Ogden, president of Shipp Belting, identified that specific service area to Aamer Hussain when he approached Mr. Ogden to solicit Shipp Belting's business for ICL America and International Conveyors in 2007.[14] With this knowledge, Mr. Hussain placed no limitations on the area of operation for Shipp Belting when the agreement for Shipp Belting to order its belting requirements through ICL America was consummated. Shipp Belting's records reflect that in 2009, the company purchased $285,048.31 in International Conveyors' products through ICL America; the amount purchased through the date of Mr. Leger's accident was $198,735.16.

International Conveyors had independent knowledge of the potential for its products being used in Louisiana as well. Aamer Hussain testified that in 2009, he

---

[12] At no time did International Conveyors qualify to do business, appoint a registered agent for service of process, hire employees, own property, pay taxes, keep accounts or books, market its products, or enter into contracts with individuals or companies in Louisiana.

[13] The other states are Texas, Oklahoma, Arkansas, Kansas, and Mississippi.

[14] Mr. Ogden testified to this fact with confidence because it was his policy to inform all vendors servicing Shipp Belting of its sales territory to avoid conflicts with the vendor's other customers servicing the same sales area.

assisted International Conveyors in compiling a bid package to obtain the business of Cargill, a Minneapolis, Minnesota based corporation, and the bid submitted by International Conveyors addressed Cargill's requirements for Louisiana facilities at Port Allen, Westwego, Reserve, and Avery Island. Mr. Hussain further acknowledged that a Carlsbad, New Mexico customer purchasing International Conveyor products also maintained operations in Faustina and Independence, Louisiana; although he could not say whether the New Mexico company ever shipped the manufactured belting to those locations.

To avoid Aamer Hussain's information concerning the use of its products in Louisiana, being attributed to it, International Conveyors takes the position that its only relationship with ICL America is that of manufacturer and wholesale distributor. That is to say, it took no part in the way ICL America marketed its products, and it provided ICL America with no assistance, such as catalogs, pamphlets, or promotional videos. International Conveyors further suggests that ICL America has no ownership interest in, is not a subsidiary of, and is not the parent company of International Conveyors. Likewise, International Conveyors does not have an ownership interest in, is not a subsidiary of, and is not the parent company of ICL America. None of ICL America's officers or members of its board of directors serve as officers or members of International Conveyors' board of directors or vice versa. Additionally, Shipp Belting did not order the defective material directly from International Conveyors. Instead, it placed the order through ICL America.

This argument ignores the clear evidence contained in the record to the contrary. The very initials used by Aamer Hussain in forming his company and his father's relationship with International Conveyors illustrates the weakness of this

argument. Mr. Hussain ran a one-man show out of his home, without any warehouse space or inventory of products and with International Conveyors as his only supplier. ICL America does not advertise, does not accept online purchases on its website, and recruits customers by solicitation in person or by telephone, email, or fax. In short, it is simply a flow-through company for the primary benefit of International Conveyors. Because it does not maintain an inventory, ICL America obtains a binding order from a distributer before requesting delivery of the needed product from International Conveyors. Sometime the product is shipped directly to the distributor, and other times it is shipped to ICL America and forwarded to the distributor. In any event, the process is that ICL America purchases conveyor belt material primarily from International Conveyors[15] and transfers it to distributors, who in turn sell the product to other distributors, wholesalers, or the end users.

Although the record contains evidence to the contrary, Mr. Hussain claimed to be the only employee of ICL America. When confronted with a printout from ICL America's website listing him, B. L. Roy and Nirmal Murkherjee as employees of the company, Mr. Hussain denied that either Mr. Roy or Mr. Murkherjee worked for the company. He suggested that the website had since been corrected to delete reference to either man. Strangely, Mr. Roy was listed as having worked for the company since 2000, although it was only formed in 2003. The website listed Mr. Murkherjee as a twenty-year employee, and this employment also would have been before the company was formed. The reference to these two individuals' employment predating the formation of ICL America

_____

[15] Aamer Hussain testified that when he formed his company, International Conveyors was his only supplier, but by March of 2010, ICL America was purchasing from other conveyor belt material suppliers. Still, it is clear from the record that International Conveyors remains its primary supplier, if not the only supplier.

raises the question of whether they were associated with International Conveyors instead of ICL America.

The direct connection between International Conveyors and ICL America is further set out by statements in International Conveyors' 2006-2007 annual report which related to "[o]n-site training and product demonstration at the customer's premises"; "Ongoing support and guidance throughout the tenure of product use"; and "Appointment of M/S Witeck Consultants, Inc., an American marketing firm, possessing an exhaustive client database that serves as the intermediary between [International Conveyors] and the Company's customers in the USA and Canada." International Conveyors had no on-site support personnel and this reference can only be to Aamer Hussain and ICL America. While initially denying that he was the "support and guidance" person for International Conveyors and denying knowledge of International Conveyors appointing M/S Witeck Consultants, Inc., as its intermediary, Aamer Hussain ultimately acknowledged that he formed that consultant company and that its corporate address was his home address in East Rockaway, New York.

While denying any connection with ICL America, International Conveyors saw fit to cause the company to be identified as a certificate holder on a commercial general-liability insurance policy issued to it by ICICI Lombard General Insurance Company, Ltd. When questioned why ICL America was a certificate holder, Mr. Hussain could not answer the question. He simply stated, "I wouldn't know, sir. I just know that I'm a certificate holder on a liability insurance coverage."

The most telling testimony from Mr. Hussain came when questioned about his father. Mr. Hussain admitted that he knew his father was involved in the

belting industry in India, but claimed not to know the specifics of that involvement. During the twenty-three years since he left India and despite visiting his family often, he claims to never have had a discussion with his father concerning his father's employment. When questioned about an International Conveyors' announcement, effective February 14, 2014, that his father was resigning from his position as director, Mr. Hussain stated, "As far as I know, he was associated with them, and that's all I know." When asked specifically if he knew that his father was connected to International Conveyors prior to March of 2010, he stated, "The answer would be yes."

### *Summary of the Issues*

The end result of our analysis is that we do find that minimum contacts existed between International Conveyors and the State of Louisiana, such that the maintenance of suit against it here does not offend traditional notions of fair play and substantial justice. *Southeast Wireless Network, Inc.*, 954 So.2d 120.

International Conveyors specifically targeted the North American market, including the entire United States, beginning in 2002. However, it did not target the end-user market. Instead, it targeted the distributor market, and by 2010, it was supplying distributors in thirteen different states, who in turn sold the belting material to customers in twenty different states.[16] In deliberately placing its conveyor belting products into the stream of commerce within the United States, by selling directly to distributors rather than to end users, International Conveyors cannot argue that the distributors in the thirteen states or the customers in the twenty states must limit sales of the products to an intrastate market. Simply stated,

---

[16] International Conveyors knew that the belting it sold would continue in the stream of commerce because it sold the belting in bulk rolls of 600 feet or longer and sixty inches in width. The belting remained in bulk until customized by the retail seller pursuant to the purchasing end user's specifications.

International Conveyors chose the *entire North American market* and not just certain states within that market. When International Conveyors provided its products to the distributors in the thirteen states, neither it nor ICL America placed any sales limitations on the area those distributors could service. ICL America was only a middle man or a broker for International Conveyors' United States sales, and International Conveyors specifically knew that ICL America and the distributors, such as Shipp Belting, were not end-users and that its belting would continue in the stream of commerce until it was finally sold to an end user such as Peoples Moss Gin.

Considering the agrarian nature of Louisiana, the reputation of the state as a source of seafood, the location of major ports along the coast and up the mouth of the Mississippi river, the amount of goods transported on the Mississippi River and the Intercoastal Canal, and the number of industries located throughout the state, it is reasonable to expect that there would be a great need for conveyor-belt systems for the handling of goods in this state, and, necessarily, a great need for belting. Thus, International Conveyors "reasonably could have expected that" as one of the largest manufacturers of belting, its belting would be sold to Louisiana customers. *Ainsworth v. Moffett Eng'g, Ltd.*, 716 F.3d 174, 179 (5th Cir. 2013), *cert. denied*, __ U.S. __, 134 S.Ct. 644 (2013). And, in fact, sixty percent of the PVC 250 belting sold by Shipp Belting was sold to customers in Louisiana.

Based on our finding that International Conveyors delivered its belting into the stream of commerce with the expectation that it would be purchased by or used by end users in Louisiana, we find that the Legers established the existence of minimum contacts by International Conveyors purposefully directed to this state,

14

such that it reasonably could have anticipated being haled into court in Louisiana. *Southeast Wireless Network, Inc.*, 954 So.2d 120.

In light of this finding, it is presumed that jurisdiction is reasonable; thus, the burden shifts to International Conveyors to prove otherwise. *Id.* Although International Conveyors will face a considerable burden in traveling from India to defend itself in a Louisiana court, we find that its burden is outweighed by the significant interest Louisiana has "in adjudicating a dispute that involves a sale of an allegedly defective product to a Louisiana consumer where that product causes a personal injury in this state." *Ruckstuhl v. Owens Corning Fiberglas Corp.*, 98-1126, p. 15 (La. 4/13/99), 731 So.2d 881, 890-91, *cert. denied*, 528 U.S. 1019, 120 S.Ct. 526 (1999). Additionally, International Conveyors is a globally-marketed company, who in purposefully targeting the North American belting market, has had the foresight to protect itself from just this eventuality by securing worldwide commercial-liability insurance coverage, which includes the costs of legal defense.

The facts further reveal that International Conveyors has attempted to shield itself from suit in forums such as Louisiana by the placement of a straw man between itself and the distributors and end users of its products. However, the evidence is overwhelming that a connection exists between International Conveyors and ICL America. Without repeating that which has already been stated, we simply note that the testimony of Mr. Hussain was totally unbelievable. Throughout the deposition, Mr. Hussain was very evasive in his answers and purported to know little or nothing about his own company, much less International Conveyors. It was necessary to pull out an admission from him concerning his father's relationship with International Conveyors, but even then, he continued to deny the connection between the two companies.

15

Considering this evidence, we find that a relationship exists between International Conveyors and ICL America, such that the placement of ICL America as a middle man between International Conveyors and its customers will not shield it from the exercise of jurisdiction in this matter.

Accordingly, we find that the Legers' and Louisiana's interests in adjudicating this matter in Louisiana, far outweighs any burden that International Conveyors might bear in defending itself in court here.

## DISPOSITION

For the foregoing reasons, we reverse the trial court's grant of the exception of lack of personal jurisdiction in favor of International Conveyors Limited and the dismissal of the claims of Huey and Gwen Leger against that defendant; and we remand this matter to the trial court for further proceedings. We assess all costs of this appeal to International Conveyors Limited.

**REVERSED AND REMANDED.**